# United States Court of Appeals
## For the First Circuit

Volume I of II

No. 02-1619

THAMES SHIPYARD AND REPAIR COMPANY,
Plaintiff in Cross Claim, Appellant,

v.

UNITED STATES,
Defendant, Appellee.

No. 02-1620

NORTHERN VOYAGER LIMITED PARTNERSHIP;
ONEBEACON AMERICA INSURANCE COMPANY f/k/a/
COMMERCIAL UNION INSURANCE COMPANY,
Plaintiffs, Appellants,

v.

UNITED STATES,
Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before
Torruella, Circuit Judge,
Campbell and Stahl, Senior Circuit Judges.

Thomas J. Muzyka, with whom Robert E. Collins and Clinton & Muzyka, P.C. were on brief, for appellant Thames Shipyard and Repair Company.
Michael J. Rauworth, with whom Cetrulo & Capone LLP were on brief, for appellants Northern Voyager Limited Partnership and OneBeacon America Insurance Company f/k/a Commercial Union Insurance Company.

Stephen F. White, with whom Wright, Constable & Skeen LLP was on brief, for amicus curiae C-Port, Incorporated.

Peter F. Frost, Trial Attorney, Civil Division, with whom Robert D. McCallum, Jr., Assistant Attorney General, Donald J. Sullivan, United States Attorney, and Peter Levitt, Assistant United States Attorney, were on brief, for appellee.

November 26, 2003

**CAMPBELL**, <u>Senior Circuit Judge</u>.  Plaintiffs-appellants Northern Voyager Limited Partnership ("Northern Voyager") and OneBeacon America Insurance Company, along with cross claim plaintiff-appellant Thames Shipyard and Repair Company ("Thames Shipyard") appeal from the district court's award of summary judgment in favor of defendant-appellee United States in an action related to the 1997 sinking of the F/V NORTHERN VOYAGER ("NORTHERN VOYAGER") in waters off Gloucester, Massachusetts.  This Court reviews de novo a district court's grant of summary judgment, affirming the judgment only if there is no genuine issue of material fact and if the appellee is entitled to judgment as a matter of law.  <u>Yohe</u> v. <u>Nugent</u>, 321 F.3d 35, 39 (1st Cir. 2003).  We recount the history of this case in the light most favorable to the losing parties (the plaintiffs-appellants) and then address the principal questions presented.

**I.**

**A.  The Sinking of the NORTHERN VOYAGER**

On the morning of November 2, 1997, the NORTHERN VOYAGER, a 144-foot fishing vessel, was proceeding a few miles off the coast of Gloucester, Massachusetts when crewmen discovered water flooding a compartment in the ship's stern.  The flooding, which resulted when the starboard rudder dropped out of the vessel, was severe and the crew immediately began trying to pump out the water.  Despite the crew's best efforts, the water level in the compartment

-3-

continued to rise, threatening to flood the boat's engine room. If the engine room flooded, all of the NORTHERN VOYAGER's electrical pumps and generators located inside would be rendered useless.

The situation was such that the master of the NORTHERN VOYAGER, Captain David Haggerty, radioed Coast Guard Station Gloucester, told them that "[w]ater [was] coming in fast," and requested that they "get some pumps out to [the ship]." To complicate matters, a storm had passed through the area the night before, leaving swells of roughly six to eight feet. Station Gloucester (under the command of Chief Warrant Officer Wesley Dittes) responded immediately by launching a 41-foot boat, to be followed shortly thereafter by a 47-foot one. The Coast Guard also diverted a 110-foot cutter, the ADAK, to assist as On Scene Coordinator. Coast Guard Group Boston, which is organizationally superior to Station Gloucester, assumed the role of Search and Rescue Mission Coordinator.

The 41-footer arrived on the scene at approximately 9:15 a.m. and immediately evacuated eight crew members who apparently requested to leave the NORTHERN VOYAGER, leaving on board of the original crew Captain Haggerty, the engineer, and the first mate. Two Coast Guardsmen, Petty Officers Adam Sirois and Brian Conners, boarded the NORTHERN VOYAGER and attempted to assist in continuing efforts to remove water from the ship using extra pumps supplied by the Coast Guard. Although what was done slowed the rate of water

accumulation, the flooding continued and the NORTHERN VOYAGER began to develop a port side list.

As the NORTHERN VOYAGER rolled and began to list, Coast Guard Officer Dittes (aboard the 47-footer), Group Boston, and the On Scene Coordinator began discussing the possibility that the vessel would need to be evacuated. Several factors worried Dittes. His most immediate concern was that the vessel's port side tilt made both access to and escape from the NORTHERN VOYAGER more difficult. This is because the fishing boat's only access port, a door from the shelter deck through which the crew boarded and departed from the boat, was on the starboard side. As the fishing boat tilted more and more to port, the starboard side was raised higher and higher off the surface of the water. No less worrisome was his concern about progressive flooding, which was causing the vessel to settle further in the water, with the danger that the boat would capsize without warning before it sank, trapping anyone aboard before they could be rescued.

Based upon these concerns, Dittes's conversations with NORTHERN VOYAGER crew members who had already boarded the 47-footer, and the continual progression of the flooding, Dittes ordered his men to evacuate the NORTHERN VOYAGER's remaining crew members. Captain Haggerty opposed the Coast Guard's decision to evacuate his vessel and wanted to talk about other options for pumping and salvage, including commercial salvage.

Dittes and Conners refused to discuss any other options for salvage aboard the NORTHERN VOYAGER, and, again, ordered Haggerty and his men off the boat. According to Captain Haggerty, Conners informed him that if he did not cooperate, the Coast Guard would "subdue [him] physically" in order to take him off the NORTHERN VOYAGER. All Coast Guard personnel and the remaining NORTHERN VOYAGER officers were then transferred to the Coast Guard 47-footer.

The NORTHERN VOYAGER was abandoned at 10:27 a.m., continued to sink, and capsized at 11:22 a.m., fifty-five minutes after the last person left the vessel. Captain Haggerty did not want to stay around and watch the boat sink. Accordingly, shortly after the evacuation, the Coast Guard 47-footer headed back to Station Gloucester with Captain Haggerty and the remaining members of his crew on board.

According to plaintiffs' experts, there were various steps that Captain Haggerty and his senior crew could have taken to stabilize the situation if the Coast Guard had permitted them to stay on the vessel. These steps included shutting certain doors and making them watertight so that the flooding was confined to two compartments in the stern of the boat. If these steps had been taken, plaintiffs' experts asserted, the vessel could have floated for at least another twenty hours even assuming that no pumping capacity was brought to bear. This would have provided ample time

for independent salvage resources to reach the vessel, even if they had to come from as far away as Boston.

## B.  Alternative Salvage Efforts Were Underway

While Coast Guard rescue efforts were underway, radio traffic about the NORTHERN VOYAGER was overheard by a commercial salvor named Michael Goodridge based in Newburyport, Massachusetts. At 9:03 a.m., just minutes after Captain Haggerty first radioed for Coast Guard assistance, Goodridge placed a telephone call to Station Gloucester.  He told them that he had dive gear and pumps and asked whether they needed assistance.  Station Gloucester responded that they were busy and they were going to "handle it."

At 9:04 a.m., Captain Haggerty informed the Coast Guard by radio that he thought the water was coming up through the vessel's rudder-post.  He conjectured that the NORTHERN VOYAGER "might ah, dropped the rudder."  Earlier, he had explained that the vessel had lost its steering capability.

Several minutes later, the Coast Guard transmitted an Urgent Marine Information Broadcast stating that it "ha[d] received a report that the Fishing Vessel Voyager is taking on water" and requesting that "all vessels keep a sharp lookout, assist if possible, [and] report all sightings to the U.S. Coast Guard." This was the Coast Guard's only attempt to solicit outside assistance.

Himself a diver, Goodridge, who continued to monitor developments over his radio, recognized that the "vessel was going to need a diver to correct the problem." Accordingly, he began loading up his truck. At 9:15 a.m., Goodridge placed a telephone call to Cape Ann Divers to see if anyone was available to assist him. At 9:33 a.m., he reported to Station Gloucester that he was en route, with diving gear, and that his estimated time of arrival was one hour.

At 10:03 a.m., several minutes before the decision to evacuate was made, Goodridge hailed Station Gloucester on radio channel 16. He was told to switch to channel 12, a frequency not being used by anyone on the scene. Goodridge stated that he was boarding a vessel at Cape Ann Marina, and asked if he should bring extra pumps or whether just diving assistance was necessary.

Station Gloucester responded that it "wasn't sure," the situation was unstable, and it needed to keep "[the] frequency clear."[1] Goodridge interpreted this to mean that he shouldn't tie up the channel. He stated that he would be there "in a little bit," and he got off the radio. Shortly thereafter, everyone was evacuated from the NORTHERN VOYAGER.

---

[1]The comment about the need to keep the frequency clear was conceded by the Coast Guard employee who made it to be a misstatement. The Coast Guard employee said that it was a "bad choice of words," that Goodridge's contact came at a time when she needed to listen, and that what she should have done was to ask Goodridge to "wait out."

-8-

At about 10:44 a.m., when Goodridge was about a mile from the Northern Voyager, he contacted Station Gloucester by radio hoping to establish contact with the captain. At that point, Goodridge had just seen the 47-footer heading back with the crew. Station Gloucester told him to call by "land line." When Goodridge called back on his cellular phone, he was told that he could talk to the captain when he arrived back at the station.

Goodridge said that he did not attempt to contact the 47-footer directly because he had "[b]een told twice to stay off the radio." He didn't bother going to the station to talk to the captain because he assumed that, based on the Coast Guard reports, the boat was too far gone for him to take the necessary time.

According to plaintiffs' expert, Goodridge was in a position to reach the NORTHERN VOYAGER by 10:50 a.m., well before it sank. Goodridge stated at his deposition that he had the skill and equipment necessary to dive under the NORTHERN VOYAGER and plug the hole formerly containing the rudder post, and the task would have taken him only a couple minutes.[2] However, he needed to talk to somebody in the NORTHERN VOYAGER crew before making such an attempt in order to find out if the engines were running. Without this knowledge, it was too risky to dive near the propellers, as he would have had to do to plug the rudder tube.

---

[2]Plaintiffs' expert stated that there were many available objects, such as a lobster buoy or life jacket, that Goodridge could have used to plug the hole and that this would have stopped, or at least considerably reduced, the influx of sea water.

Captain Haggerty stated that he did not know any commercial salvors in the Gloucester area and thought that the Coast Guard was working on getting commercial assistance.  At no time before the captain was put ashore in Gloucester, however, did he learn, nor was he told by the Coast Guard, that a salvor was approaching with additional pumps and with dive gear.[3]  If the captain had been in contact with Goodridge and had been made aware of his concerns about the engine running, the captain would have shut off the engines before evacuating, rigged a Jacobs ladder in order to facilitate a possible return to the boat, and communicated this information to Goodridge.

## C.  Proceedings in the District Court

Northern Voyager, its insurers, and Thames Shipyard brought this action in the District of Massachusetts against the United States alleging that the sinking of the NORTHERN VOYAGER was due to the negligence of the Coast Guard.  Plaintiffs' primary contention was that the Coast Guard exceeded its authority by coercively compelling the NORTHERN VOYAGER's master to leave the vessel against his will.  Plaintiffs  further alleged that the Coast Guard negligently interfered with the efforts of Michael Goodridge, the commercial salvor, and also deprived the NORTHERN

---

[3]The record contains conflicting evidence on this point, but we, of course, take the evidence in the light most favorable to the losing party.

VOYAGER of other possible sources of assistance in its time of peril.[4]

The United States contended that the Coast Guard was legally authorized to issue the evacuation order by virtue of the broad search and rescue powers conferred upon the Coast Guard by Congress under 14 U.S.C. § 88 to "perform any and all acts necessary to rescue and aid persons . . . " See note 7, infra. It further argued that the decision to issue the order in these circumstances was a decision protected under the discretionary function exception. The United States moved for summary judgment on the grounds that the suit was barred by the exception. In respect to plaintiffs' arguments that the Coast Guard negligently interfered with the commercial salvor's efforts, the United States contended that these arguments failed under the "Good Samaritan" doctrine requiring a would-be rescuer to have worsened the victim's position.

The district court concluded that the Coast Guard's decision to compel Haggerty and his crew to abandon the NORTHERN VOYAGER was protected by the discretionary function exception.

---

[4]In addition, plaintiffs alleged various intentional torts including trespass to chattels, conversion, breach of fiduciary obligations, bailment, and intentional interference with contractual and/or advantageous relations. Our discussion, infra, concluding that the Coast Guard's evacuation decision is protected by the discretionary function exception disposes of most of these claims. We do not think that the alleged facts support a claim of intentional interference with contractual or advantageous relations.

Northern Voyager Ltd. P'ship v. Thames Shipyard & Repair Co., 214 F. Supp. 2d 47, 52 (D. Mass 2002). Though the court did not cite to or evaluate the scope of 14 U.S.C. § 88, it did cite internal government manuals as stating the need for broad discretion and flexibility when conducting search and rescue operations. Id. Applying the discretionary function test articulated in Berkovitz v. United States, 486 U.S. 531, 537 (1988), the court concluded that (1) the Coast Guard has complete discretion over all search and rescue procedures; and (2) the Coast Guard's decision to evacuate the NORTHERN VOYAGER is the type of "policy based discretion" protected by the exception. Id. at 51-52. Once it concluded that plaintiffs' claims are barred by the discretionary function exception, the court granted the United States' motion for summary judgment.

This appeal followed.

## II.

The United States, as sovereign, is immune from suit except as it consents to be sued, and the terms of its consent define the federal courts' jurisdiction over suits against the United States. United States v. Sherwood, 312 U.S. 584, 586 (1941). The Suits in Admiralty Act ("SAA") waives sovereign immunity "[i]n cases where if such vessel were privately owned or operated . . . or if a private person or property were involved, a proceeding in admiralty could be maintained . . ." 46 U.S.C. Appx.

§ 742. The Public Vessels Act ("PVA") allows recovery against the United States for damages "caused by a public vessel of the United States . . ."[5] 46 U.S.C. Appx. § 781.

Both waiver provisions apply here. See Wilson v. United States, 23 F.3d 559, 561 (1st Cir. 1994) ("Both the [SAA] and the [PVA] apply where a plaintiff brings a 'public-vessel-related suit in admiralty against the United States.'") (internal citation omitted). Although neither contains an express discretionary function exception, it has been implied into both. See Limar Shipping Ltd. v. United States, 324 F.3d 1, 6-7 & n.3 (1st Cir. 2003) (SAA); United States Fire Ins. Co. v. United States, 806 F.2d 1529, 1534-35 (11th Cir. 1986) (PVA) (reasoning that the "separation of powers" concerns that justify reading a discretionary function exception into the SAA warrant reading the same exception into the PVA, especially given the close relationship between the two statutes). We review de novo the lower court's determination that the Coast Guard's actions are protected by the discretionary function exception. See Wood v. United States, 290 F.3d 29, 36 (1st Cir. 2002).

A. **The Discretionary Function Exception: the Standard Test**

---

[5]The PVA embraces cases where injury is caused by the crew of a public vessel and not by the vessel itself. See Coumou v. United States, 107 F.3d 290, 294 n.9 (5th Cir.), modified, 114 F.3d 64 (5th Cir. 1997); Harrington v. United States, 748 F. Supp. 919, 929 (D.P.R. 1990).

The purpose of the discretionary function exception is to insulate certain governmental actions and decisions based on considerations of public policy from tort liability by private individuals. Berkovitz, 486 U.S. at 536-37. The exception is intended to preclude "judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." Limar Shipping, 324 F.3d at 6 (quoting United States v. S.A. Empresa de Viacao Aearea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984)). Thus, the discretionary function exception "insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." Berkovitz, 486 U.S. at 537.

Where, as here, the government avers that it is immune from suit because the challenged conduct falls under the protection of the discretionary function exception, we must determine whether the disputed conduct involved the "permissible exercise of policy judgment." Berkovitz, 486 U.S. at 539. In a series of cases, the Supreme Court has established an analytical framework for determining whether the conduct warrants discretionary function immunity.

The court must initially identify the conduct that allegedly caused the harm. United States v. Gaubert, 499 U.S. 315, 322 (1991). Then, to determine whether the exception applies, the court employs a two prong test. First, the court must

-14-

determine whether the challenged conduct involves an element of judgment, meaning that it is "a matter of choice for the acting employee." Berkovitz, 486 U.S. at 536. This Court has declared that conduct is non-discretionary "if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action." Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir.), cert. denied, 2003 WL 21692180 (U.S. Oct. 6, 2003) (No. 03-25). Second, the court "must determine whether that judgment is of the kind that the discretionary function was designed to shield," meaning that it involved "governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 536-37.

In addition, courts have read the Supreme Court's discretionary function cases as denying protection to actions that are unauthorized because they are unconstitutional, proscribed by statute, or exceed the scope of an official's authority. See, e.g., K. W. Thompson Tool Co. v. United States, 836 F.2d 721, 727 n.4 (1st Cir. 1988) ("It has been held that implicit in Varig and Dalehite is the proposition that a 'decision cannot be shielded from liability if the decisionmaker is acting without actual authority.'") (quoting Red Lake Band of Chippewa Indians v. United States, 800 F.2d 1187, 1196 (D.C. Cir. 1986)); Medina v. United States, 259 F.3d 220, 225 (4th Cir. 2001) (stating that "[f]ederal officials do not possess discretion to violate constitutional

-15-

rights or federal statutes") (quoting <u>United States Fid. & Guar. Co.</u> v. <u>United States</u>, 837 F.2d 116, 120 (3d Cir. 1988)); <u>Nurse</u> v. <u>United States</u>, 226 F.3d 996, 1002 (9th Cir. 2000) ("[G]overnmental conduct cannot be discretionary if it violates a legal mandate."); <u>Myers & Myers, Inc.</u> v. <u>United States Postal Service</u>, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").

**B.   The Decision to Forcibly Evacuate the NORTHERN VOYAGER.**

Following this framework, we focus on the decision to forcibly evacuate the NORTHERN VOYAGER. Relying on <u>Indian Towing Co.</u> v. <u>United States</u>, 350 U.S. 61 (1955), and <u>United States</u> v. <u>Sandra & Dennis Fishing Corp.</u>, 372 F.2d 189 (1st Cir. 1967), appellants contend that the discretionary function exception applies to decisions whether or not to undertake a rescue mission but not to decisions made during the course of a rescue mission once undertaken. Appellants further contend that the Coast Guard's evacuation decision was not a policy decision. Finally, appellants argue that the government cannot seek refuge in the exception because the forcible evacuation was outside the scope of its statutorily-delegated authority and, indeed, violated legal and constitutional norms. We disagree.

**1.   Whether <u>Indian Towing</u> and <u>Sandra & Dennis Fishing Corp.</u> Preclude Application of the**

**Discretionary Function Exception to the Decision at Issue.**

We begin by addressing plaintiffs' argument based on Indian Towing and Sandra & Dennis Fishing Corp. For the following reasons, we do not think that these cases support plaintiffs' argument that the discretionary function exception is inapplicable to decisions made during the course of a rescue mission to the extent those decisions implicate protected policy concerns.

Indian Towing involved a lawsuit alleging that the Coast Guard negligently failed to maintain a lighthouse, causing the loss of a ship. The Court held that the Coast Guard need not undertake to provide lighthouse service. Indian Towing, 350 U.S. at 69. However, having "exercised its discretion to operate [the] light . . . and engendered reliance on the guidance afforded by the light, [the Coast Guard] was obligated to use due care to make certain that the light was kept in working order." Id.

Indian Towing is inapposite for two reasons. First, the discretionary function exception was not at issue because the government conceded that it did not apply. Id. at 64. Second, as this Court has interpreted the case, through the lens of later Supreme Court decisions, it illustrates a situation where there was no exercise of policy judgment but rather involved purely technical or scientific considerations. Ayer v. United States, 902 F.2d 1038, 1042 (1st Cir. 1990). Indeed, we have suggested that had a

policy-based reason for failing to maintain the lighthouse been articulated, the result might have been different.  See id.

In Sandra & Dennis Fishing Corp., a Coast Guard patrol boat took in tow a fishing vessel that was then in no immediate danger of sinking and, through negligence (human error), caused the vessel to strand on a shoal.  This Court stated that the Coast Guard had no duty to provide rescue services on demand.  Sandra & Dennis Fishing Corp., 372 F.2d at 195.  However, we held that "if the Coast Guard accepts a mission it should conduct its share of the proceeding with acceptable seamanship."  Id. at 197.

There is no hint in Sandra & Dennis Fishing Corp. that the government attempted to rely on the discretionary function exception.  Nor is there any reason to think that the negligent conduct upon which this Court affirmed liability (the failure to check with the loran on the towed vessel when the loran on the Coast Guard patrol boat went out) implicated protected policy concerns as opposed to mere technical, navigational missteps.  Accordingly, neither Indian Towing nor Sandra & Dennis Fishing Corp. stand for the proposition that a Coast Guard determination made during the course of a mission may not be protected by the discretionary function exception in otherwise appropriate circumstances.

Indeed, to hold differently could be said to fly in the face of the Supreme Court's decision in Gaubert, 499 U.S. at 325-

-18-

26, which rejects a distinction between initiation of programs and decisions made at an operational level. See also Varig Airlines, 467 U.S. at 813 ("[T]he basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee--whatever his or her rank--are of the nature and quality that Congress intended to shield from tort liability.") Accordingly, we turn next to the familiar two-prong inquiry, supra p. 14-15, under Berkovitz and progeny. For the following reasons, we conclude that both prongs are met.

## 2. **Application of the Two-Prong Inquiry**.

First, the Coast Guard has statutorily-granted discretion to exercise its judgment in determining how it goes about search and rescue ("SAR") operations. See 14 U.S.C. § 88 (providing that the Coast Guard *may* perform any and all acts necessary to rescue and aid persons and property). Further, internal manuals recognize the discretionary nature of decisions made during the course of SAR operations. The National Search and Rescue Manual notes that "[b]ecause of the many variables encountered during SAR operations and the individuality of each SAR case, the guidance provided in this Manual must be tempered with sound judgment, having due regard for the individual situation." 1 Joint Chiefs of Staff & U.S. Coast Guard, National Search and Rescue Manual v, § 3.a (1991). The Coast Guard Addendum to this manual provides that "Coast Guard personnel are expected to exercise broad discretion in performing

-19-

the functions discussed."  U.S. Coast Guard, <u>Coast Guard Addendum to the National Search and Rescue Manual</u> at 2.

Second, the determination that the peril to the endangered seamen had reached such a level as to require a forced evacuation involved a true policy choice.  This case does not fall within the "line of cases involving plaintiffs who challenge official judgments that implicate technical safety assessments conducted pursuant to prior choices."  <u>Shansky</u> v. <u>United States</u>, 164 F.3d 688, 694 (1st Cir. 1999).  "Such decisions come within a category of objective professional judgments that, without more, are not readily amenable to policy analysis."  <u>Id.</u>  Rather, it involved the balancing of incommensurable values -- such as human safety, protection of property, autonomy, and the allocation of resources -- typically associated with policy decisions.[6]  <u>See id.</u> at 695.  The Coast Guard's manual sets forth a policy of giving priority to the saving of human lives over the saving of property. <u>See</u> <u>infra</u> p. 25.  Applying such a policy in circumstances of danger such as these calls for an evaluation  of multiple factors that is anything but purely technical and routine.

_____

[6]The last factor (allocation of resources) comes into play especially because, despite appellants' suggestion to the contrary, the Coast Guard, once on the scene, would have been hard pressed simply to abandon the imperilled seamen.  If the ship had capsized, trapping the men inside or putting them overboard, the Coast Guard would have been faced with a riskier, more costly rescue operation that might have endangered the lives of Coast Guard personnel seeking to rescue those members of the NORTHERN VOYAGER's crew who had elected to remain on board.

-20-

### 3.  The Scope of 14 U.S.C. § 88.

Finally, we turn to appellants' contention that the discretionary function exception does not apply because the Coast Guard acted outside the scope of its statutorily-granted authority or in derogation of other constitutional and legal principles. This argument requires us to determine whether 14 U.S.C. § 88, which provides inter alia that the Coast Guard may perform "any and all acts necessary to rescue and aid persons and protect and save property," permits the Coast Guard, when it deems such action necessary to protect lives, to compel an unwilling master to evacuate his vessel.[7]  This is a novel question in that, while similar events may have arisen in the past, no federal cases

---

[7]The pertinent part of § 88 provides in full:

> (a)  In order to render aid to distressed persons, vessels, and aircraft on and under the high seas and on and under the waters over which the United States has jurisdiction and in order to render aid to persons and property imperiled by flood, the Coast Guard may:
> (1) perform any and all acts necessary to rescue and aid persons and protect and save property;
> (2) take charge of and protect all property saved from marine or aircraft disasters, or floods, at which the Coast Guard is present, until such property is claimed by persons legally authorized to receive it or until otherwise disposed of in accordance with law or applicable regulations, and care for bodies of those who may have perished in such catastrophes;
> (3) furnish clothing, food, lodging, medicines, and other necessary supplies and services to persons succored by the Coast Guard; and
> (4) destroy or tow into port sunken or floating dangers to navigation.

interpreting the Coast Guard's powers in this regard appear to exist in the law books, nor have any specific regulations been promulgated on the subject by the Coast Guard. Moreover, the legislative history of § 88 does not address this particular issue.[8] On the one hand, the statute's literal language (empowering the Coast Guard to "perform any and all acts necessary to rescue and aid persons . . . ") can be said literally to encompass such action. On the other, in our democratic society the circumstances are limited in which governmental officials may legally compel people, against their will, to abandon their homes or other private property. If it were unconstitutional or contrary to clear law for the Coast Guard to rescue unwilling mariners in life-threatening situations, we would be loath to read such authority into § 88.

Given the dearth of federal authority, we turn to state law and practice in analogous rescue situations for guidance.

---

[8]Section 88 was added to Title 14 in 1949. <u>See</u> Act of Aug. 4, 1949, c. 393, 63 Stat. 501. The Senate Report that accompanied the legislation explains that previous "statutes were enacted over a period of a century and cover[ed], in some cases, only limited geographical areas, and in other cases only limited types of assistance work," and that "section 88 authorizes the Coast Guard, in the broadest possible terms without limitation as to method or place, to save lives and property." S. Rep. No. 81-656, at 5 (1949), <u>reprinted in</u> 1949 U.S. Code & Cong. Serv. 1652, 1656. This history suggests that the phrase "any and all acts" defines the scope of Coast Guard authority and, is not, as plaintiffs contend, merely an implementary provision. Further, it is plain that Congress intended the scope of this power to be broad. Nonetheless, nothing in the legislative history specifically addresses the power to order forcible evacuation.

Almost every state in the United States has adopted statutes providing for the exercise of police powers in the event of an emergency or disaster (such as fire, flood, tornado, hurricane, etc.) See Howard D. Swanson, The Delicate Art of Practicing Municipal Law Under Conditions of Hell and High Water, 76 N.D.L. Rev. 487, 490-93 & n.10 (2000) (citing statutes). Most of the state statutory schemes provide that the governor of the state has the ability to declare an emergency. See id. at 490. "Further, most of the states also allow the exercise of emergency or disaster authority by a local government." Id. One of the most common forms of authority exercised in an emergency is the mandatory evacuation of buildings, streets, neighborhoods, and cities. Id. at 495, see also David G. Tucker & Alfred O. Bragg, III, Florida's Law of Storms: Emergency Management, Local Government, and the Police Power, 30 Stetson L. Rev. 837, 838 (Winter 2001) ("Local decision-makers may be called upon to order evacuations or prevent people from returning to damaged houses.").

In some states, there are statutes that expressly delegate to local safety officers the authority to order evacuations in an emergency. See, e.g., Alaska Stat. § 18.70.075(a)(2) (providing that a fire officer has the authority to "order a person to leave a building or place in the vicinity of a fire or emergency, for the purpose of protecting the person from injury"); Conn. Gen. Stat. § 7-313b (similar); Del. Code Ann. tit.

16, § 6701A(2) (similar); N.H. Rev. St. Ann. § 154:7 (similar); Tenn. Code Ann. § 6-21-703 (similar); W. Va. Code § 29-3A-1 (similar). In other states, where the issue is not expressly addressed in any statute, the authority of a safety officer to order an evacuation has been inferred from a statute delegating general authority "to preserve the public peace." See, e.g., Ohio Op. Atty. Gen. No. 87-099 (reasoning in this way and opining that a sheriff "may order the evacuation of persons residing . . . in the vicinity of a hazardous materials accident or emergency, when reasonably necessary for the protection of the health, safety, and well-being of such persons" and "may, in a reasonable manner, remove to a safe area any persons who refuse to evacuate voluntarily").[9]

The Coast Guard is a governmental agency and has been granted by Congress a variety of public safety responsibilities and

---

[9]We have no doubts about the constitutionality of such authority. Courts have rejected due process challenges to summary action taken in an emergency situation, see, e.g., Hodel v. Virginia Surface Min. & Recl. Assn., 452 U.S. 264, 299-301 (1981) (upholding the constitutionality of an emergency procedure which allowed government inspectors to order the immediate cessation of mining activities), and have similarly rejected Fourth Amendment challenges to police action taken in response to a life-threatening emergency. See, e.g., Mincey v. Arizona, 437 U.S. 385, 392 (1978) ("Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.") (internal footnotes omitted) (citing cases); see also Wayne v. United States, 318 F.2d 205, 212 (D.C. Cir. 1963) (Burger, J.) ("The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.").

powers, including, of course, the specific power under discussion to rescue and aid persons and property.[10] In exercising its rescue powers, it construes its own role as giving priority to the saving of lives over the saving of property. See U. S. Coast Guard, Boat Crew Seamanship Manual at 18-92. In circumstances such as the present, Coast Guard operations are relevantly different from the situation in which a private vessel or a commercial salvor comes to the aid of a distressed vessel.[11] Under the circumstances, we think

[10]See, e.g., 14 U.S.C. § 2 ("Primary Duties") (stating, inter alia, that the Coast Guard "shall administer laws and promulgate and enforce regulations for the promotion of safety of life and property on and under the high seas and waters subject to the jurisdiction of the United States covering all matters not specifically delegated by law to some other executive department" and "shall develop, establish, maintain, and operate, with due regard to the requirements of national defense, aids to maritime navigation, icebreaking facilities, and rescue facilities for the promotion of safety on, under, and over the high seas and waters subject to the jurisdiction of the United States").

[11]It is a general principle of admiralty law that an owner of a vessel has a right to decline salvage assistance and that "a salvor who acts without the express or implied consent of the owner is a 'gratuitous intermeddler' who is not entitled to any salvage award." 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 16-1 at 360-61 (3d ed. 2001). Interestingly, however, there is dicta in several cases limiting this principle to instances where only the owner's property interests are at stake. See, e.g., Smit Americas, Inc. v. M/T Mantinia, 259 F. Supp. 2d 118, 134 (D.P.R. 2003) (suggesting that an owner's right of refusal is limited in situations involving imminent danger of large losses of the property of third persons); Ramsey v. Pohatcong, 77 F. 996 (S.D.N.Y. 1896) (holding that tugboat was "bound to respect the master's decision [to refuse salvage assistance]" where case involved only ordinary property interests and "did not involve imminent danger to life, nor the danger of large losses of the property of third persons"); see also Martin J. Norris, The Law of Seaman, § 9:39 (4th ed. 2002) ("It is the privilege of the master to accept [proffered salvage services] or not, so long as the vessel in distress is then in a position where nothing but ordinary

it reasonable to assume that Congress, in granting the Coast Guard the broad authority to undertake "any and all acts necessary to rescue and aid persons and protect and save property," intended to confer powers analogous to those commonly possessed by state public safety officials, namely, the power to rescue a person even against his will in life-threatening circumstances.

We do not, however, accept that the phrase "any and all" gives the Coast Guard carte blanche authority to engage in forcible evacuations in <u>less</u> than life-threatening emergencies. A forcible evacuation from a private vessel constitutes a seizure of the person. Under the circumstances, the body of case law developed under the "emergency aid" exception to the Fourth Amendment's warrant requirement both lends support for evacuation authority and cabins it. That exception requires an objectively reasonable belief by safety officers that a true emergency exists and there is an immediate need for assistance or aid. <u>See</u>, <u>e.g.</u>, <u>McCabe</u> v. <u>Life-Line Ambulance Serv., Inc.</u> 77 F.3d 540, 545 (1st Cir. 1996) (recognizing that "exigent circumstances" exceptions, by their nature, turn upon the objective reasonableness of ad hoc, fact-specific assessments); <u>United States</u> v. <u>Richardson</u>, 208 F.3d 626, 629 (7th Cir. 2000) (explaining that, "as is normally the case for Fourth Amendment inquiries, the test is objective"); <u>Russoli</u> v.

property interests are involved.") (emphasis added). In all events, we need not pursue this suggestion further in light of our conclusion that the Coast Guard is not the equivalent of a commercial salvor.

<u>Salisbury Township</u>, 126 F. Supp. 2d 821, 846-59 (E.D. Penn. 2000) (suggesting without deciding that the emergency aid doctrine might justify a seizure, for the person's own good and the good of others, where safety officers reasonably believe that there is a life-threatening emergency).

In situations as the present, where we are satisfied that such a life-threatening emergency could reasonably be found to exist, <u>infra</u> p. 28, the Coast Guard possessed under § 88 the discretionary authority to order (or not order) a forced evacuation. Within the scope of that discretionary authority, we hold that the Coast Guard could not be held liable for the consequences of its decision.

### 4. The Instant Scenario

The facts of this case lead us to conclude that the Coast Guard reacted rationally, and that human life could reasonably have been deemed to be at serious risk had Captain Haggerty and his crew not been removed. The NORTHERN VOYAGER, without steering, was rolling in six to eight foot ocean seas. Water was pouring in. She was developing an increasing port-side list. The fishing boat's only access port was on the starboard side. The Coast Guardsmen on the vessel reported progressive flooding, raising the possibility that the ship would capsize, trapping all on board. While arguments can perhaps be made in the light of 20-20 hindsight tending to minimize the potential dangers had the master and his

-27-

fellows been allowed to remain, we see no basis to doubt the objective reasonableness of the Coast Guard's on the scene decision to remove them.

Under the circumstances (and in light of our conclusions above), we hold that (1) the discretionary function exception applies to the decision at issue; (2) the Coast Guard made a policy choice when it determined the time had come, in the interest of safety, to take the men off; (3) the Coast Guard acted within the broad rescue powers specified by Congress in § 88; and (4) the Coast Guard was not guilty of violating rights applicable in more ordinary circumstances (i.e. where the threat to life was less).

### C. The Coast Guard's Conduct Vis-a-vis the Private Salvor.

Plaintiffs' alternative argument is that evidence of Coast Guard alleged discouragement or interference with the efforts of Michael Goodridge, the commercial salvor, warrants a remand for a determination of liability. The government has never advanced any protected policy reasons, and we can think of none, to explain its conduct vis-a-vis the commercial salvor. Rather, to the extent that conscious decisions were made, rather than mistakes, oversights, or misstatements, the decisions appear to be ordinary professional judgments. Accordingly, we turn to the issue of liability.

Plaintiffs suggest that the Coast Guard was negligent in delaying the start of Goodridge's response, instructing Goodridge

to stay off the radio, and suppressing effective communication with him.  Plaintiffs also suggest that Captain Haggerty detrimentally relied on the Coast Guard's assurance that it was working on getting commercial assistance, and, as a result, did not make independent radio calls of his own for such commercial assistance. Although we are unpersuaded by plaintiffs' arguments based on allegations of delay and reliance, we find sufficient evidence in the record to create a factual issue on the question whether the Coast Guard's interference with the commercial salvor's communications prevented Goodridge from pursuing salvage efforts and using his diving capacity to find and plug the leak.  We explain, beginning with the relevant standard of negligence and then applying it to the facts of this case.

### 1.  The Good Samaritan Rule.

The parties agree that the standard of negligence in this context is the Good Samaritan rule "which makes one person liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous." Good v. Ohio Edison Co., 149 F.3d 413, 420 (6th Cir. 1998) (quoting Patentas v. United States, 687 F.2d 707, 713-14 (3d Cir. 1982)). This doctrine is articulated in § 323 of the Second Restatement of Torts which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is

> subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323.

A parallel rule in § 324A of the Second Restatement deals with liability to third persons:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 324A.

Under these provisions, Coast Guard liability based on negligence may be established provided it can be shown that the Coast Guard's negligence "increase[d] the risk" of harm. Plaintiffs "must show that the Coast Guard through affirmative actions caused some physical change to the environment or some other material alteration of circumstances." Good, 149 F.3d at 421 (citations and internal quotation marks omitted). "Thus, '[t]he test is not whether the risk was increased over what it would have

-30-

been if the defendant had not been negligent,' but rather whether '[t]he risk [wa]s increased over what it would have been had the defendant not engaged in the undertaking at all.'" Id. (quoting Myers v. United States, 17 F.3d 890, 903 (6th Cir. 1994)); see also Sagan v. United States, 342 F.3d 493, 498 (6th Cir. 2003) (quoting Myers).

Coast Guard liability may also be established in appropriate circumstances on a theory of induced "reasonable, justifiable" detrimental reliance. Myers, 17 F.3d at 904. The reliance must have caused another "to forgo other remedies or precautions against the risk." Id. at 903 (quoting Restatement § 324A cmt. e). In the maritime context, detrimental reliance has been found where the "Coast Guard's actions caused potential rescuers to rest on their oars . . . in reliance on the Coast Guard's undertaking and its presumed, unless affirmatively disclaimed, competency." Fondow v. United States, 112 F. Supp. 2d 119, 130 (D. Mass. 2000) (citations and internal quotation marks omitted).

A related principle, set forth in § 327 of the Second Restatement, is also relevant and has been applied in the maritime context. See Hood v. United States, 695 F. Supp. 237, 43-44 (E.D. La. 1988). Section 327 provides:

> One who knows or has reason to know that a third person is giving or is ready to give to another aid necessary to prevent physical harm

> to him, and negligently prevents or disables the third person from giving such aid, is subject to liability for physical harm caused to the other by the absence of the aid which he has prevented the third party from giving.

Restatement (Second) of Torts § 327.

Our decision in Sandra & Dennis Fishing Corp. is consistent with the Good Samaritan rule as articulated above. In Sandra & Dennis Fishing Corp., the Coast Guard clearly worsened the position of the towed vessel which, when taken in tow, was in no imminent peril. See Rodrigue v. United States, 968 F.2d 1430, 1434-35 (1st Cir. 1992) (observing that, in Sandra & Dennis Fishing Corp., "the district court made the significant finding that there would have no stranding but for the Coast Guard's misconduct"). Additionally, in Sandra & Dennis Fishing Corp., we emphasized that the Coast Guard had induced reliance upon a belief that it "would perform its functions with reasonable care." 372 F.2d at 195; see also Daley v. United States, 499 F. Supp. 1005, 1010 n.6 (D. Mass. 1980) (Aldrich, J., sitting by designation) (explaining that this comment in Sandra & Dennis must be understood against a record which showed that the disabled vessel had refrained from seeking other available assistance).

More recently, this Court discussed "the Good Samaritan rule" in a case where parents of an airman who drowned after being carried out to sea by strong currents at a recreational beach sued the Air Force based on its four-hour delay after notification in

-32-

sending a rescue helicopter.  See Rodrigue, 968 F.2d at 1434-35. We emphasized that the plaintiffs could not state a case simply by alleging that the Air Force was negligent.  See id. at 1435. Rather, it was necessary to show, more likely than not, that by its negligence the Air Force had worsened the airman's position.  Id.

Finally, we note that in evaluating Coast Guard conduct under the Good Samaritan rule, courts must consider the Coast Guard's actions and decisions in light of the information known during the rescue and not with the benefit of hindsight.  See Fondow, 112 F. Supp. 2d at 131 (citing cases).  Accordingly, "conduct that might ordinarily be negligent may be non-negligent in the pressure cooker circumstances of a rescue."  Id.

### 2.  The Standards Applied.

#### a.  The Reliance Argument.

The evidence of detrimental reliance is insufficient as a matter of law to support a finding of Coast Guard liability, and, thus, by itself would not warrant a remand.  In his sworn declaration, Captain Haggerty states that "[b]ecause the Coast Guard had told me that they were working on arranging commercial assistance, I did not make any calls on the radio."  However, he does not state exactly what the Coast Guard said or when.  See Fed. R. Civ. P. 56(e) (requiring affidavits to set forth "specific facts showing that there is a genuine issue for trial").

The only other evidence we have on this point is Haggerty's vague deposition testimony that he "asked Station Gloucester if there was anybody available, if there was any more pumps" and the response was "[w]e're working on that." The Coast Guard's response, without more, falls short of a representation that the Coast Guard was working on obtaining commercial assistance.[12] We do not think that a reasonable jury could find that Haggerty justifiably relied on the Coast Guard's vague response and reasonably refrained from making any efforts of his own to contact commercial assistance.

### b.  The Delay

Similarly, the evidence tending to suggest that the Coast Guard delayed Goodridge's departure by reason of its initial response discouraging his participation in the rescue operation is insufficient as a matter of law to warrant a remand. Goodridge's initial phone call to the Coast Guard was at 9:03 a.m. He was told they were going "to handle it." But by 9:15 a.m., notwithstanding that response, he was on the telephone to Cape Ann Divers to see who might be available to assist him. In addition, some time during that period, Goodridge took time to load his truck before notifying the Coast Guard at 9:33 a.m. that he was on his way to

---

[12]In fact, depending upon when the Coast Guard's statement was made, a natural assumption is that it was talking about the Coast Guard cutter ADAK, which arrived late on the scene with additional pumps.

assist. Viewing the evidence in the light most favorable to plaintiffs, the delay was, at most, twelve minutes. We do not think a reasonable jury could find that this brief delay was material. Plaintiffs' expert opined that Goodridge's boat was in a position to reach the NORTHERN VOYAGER on or about 10:50 a.m. Even if Goodridge had arrived at the vessel roughly twelve minutes earlier than expected, at 10:38 a.m., it would have been after the evacuation. Indeed, by 10:38 a.m. the Coast Guard 47-footer was already en route to Station Gloucester with the Northern Voyager crew on board.[13]

We add, moreover, that we see nothing wrong in the Coast Guard's response at 9:03 a.m. that they were going "to handle it." Captain Haggerty had, in fact, called the Coast Guard; they were planning to go to the NORTHERN VOYAGER's assistance; and at 9:03 a.m. the Coast Guard had yet to be informed as to many of the

---

[13]Our dissenting colleague suggests that, in addition to a twelve-minute delay of Goodridge's departure from Newburyport, the record supports a finding that the Coast Guard caused further delay once Goodridge arrived at his boat at Cape Ann Marina by its indefinite response to his query as to whether additional pumps were needed or just diving assistance. Appellants made no argument along these lines, and we are not persuaded. The transcript of the radio communication indicates the Coast Guard responded reasonably to Goodridge's inquiry by saying "we're not sure at this time." Although the dissent suggests this indefinite response caused Goodridge to spend unnecessary extra time loading pumps on board his boat, we do not see how the Coast Guard can be faulted for its response, especially given record evidence that the Coast Guard's own pumps kept failing and the possibility that, even if diving assistance were successful, some additional pumping assistance might be required.

details that might have indicated a need for Goodridge's additional assistance.

### c. Alleged Interference With/Failure to Facilitate Communications Between Goodridge and the NORTHERN VOYAGER.

Plaintiffs have a stronger argument of Coast Guard interference with Goodridge's efforts based on Station Gloucester's misstatement to Goodridge at 10:03 a.m. that it "need[ed] to keep this frequency clear." See note 1, supra. As noted, one who negligently prevents or disables a third person from giving aid necessary to prevent physical harm is subject to liability for that harm caused by the absence of the prevented aid. See Restatement (Second) of Torts § 327, supra p. 32.[14] Here a fact-finder could determine that the Coast Guard's negative responses to Goodridge, after assuming control itself of the rescue operation, prevented or disabled Goodridge from giving aid that could have prevented the NORTHERN VOYAGER from sinking.

By 10:03 a.m., Coast Guard personnel had been told by the captain that the vessel "might, ah, dropped the rudder." And in his 10:03 a.m. transmission to the Coast Guard, Goodridge indicated

---

[14]Although § 327 is arguably, by its terms, limited to physical harm to a person, it applies to claims involving property damage through the operation of Restatement (Second) of Torts § 497 ("The rules which determine negligence of conduct threatening harm to another's interest in the physical condition of land and chattels are the same as those which determine the negligence of conduct which threatens bodily harm.").

both that he was on his way and could offer diving assistance. Diving capability, given the character of the leak -- an open rudder tube allowing a pathway for the sea water to enter the ship -- could be found to have been just what the NORTHERN VOYAGER needed. The record contains expert testimony that such a leak could be contained by a diver's inserting of objects like a life preserver or lobster buoy into the opening. Goodridge testified he had the equipment and skill to have plugged the rudder leak in a matter of minutes. Yet the Coast Guard's only response was to tell Goodridge to clear the air waves.

In his deposition, Goodridge testified that the reason he did not later seek to radio the master of the NORTHERN VOYAGER, after the master had been evacuated to the Coast Guard's 47-footer, was that "he [had] been told twice to stay off the radio." We think there is sufficient evidence for a reasonable fact-finder to find that the Coast Guard's rebuff at 10:03 a.m. discouraged Goodridge from further attempts to communicate with the Coast Guard or, directly, with the NORTHERN VOYAGER, as he motored to the scene. Had he done so, plans might have developed that would have led to saving the vessel. In particular, had Goodridge communicated with Captain Haggerty, or even a knowledgeable Coast Guard officer involved in the rescue operation, advance plans could

have been discussed for Goodridge to dive under the NORTHERN VOYAGER while it was still afloat.[15]

The Coast Guard's witness, Chief Warrant Officer Dittes, conceded that the information that Goodridge was coming was "a significant piece of information" and the sort "they would normally pass to the person that's in trouble." Yet the Coast Guard did not advise the NORTHERN VOYAGER that Goodridge was on the way, much less did it note the fact that Goodridge had a diving capability which might be put to good use. Had Captain Haggerty been alerted that Goodridge was coming, and had he then communicated by radio with Goodridge, advance plans could have been laid for Goodridge to dive under the NORTHERN VOYAGER and plug the leak. There is evidence from which to infer that even if Goodridge arrived shortly after Haggerty had been removed from his sinking vessel, the dive might have been consummated had Haggerty prepared for it before leaving the NORTHERN VOYAGER. See note 15, supra.

---

[15]In his affidavit, Captain Haggerty stated in pertinent part:

> If Mr. Goodridge had been allowed to call me on the radio or by cellphone, I could have communicated with him and learned what he needed. If this had happened, I could have and would have shut off those engines, rigged a Jacobs ladder, and communicated this to him, even if we were nevertheless to be forced off the vessel thereafter.

Aff. of Captain Haggerty ¶ 8.

-38-

We do not suggest the Coast Guard had an independent duty of its own to provide a commercial diver.[16] Even if it exercised poor judgment in not doing so, it would not be civilly liable unless its negligence worsened the situation over what it would have been had the Coast Guard not come to the aid of the NORTHERN VOYAGER. But its announcement to Goodridge that it was "handling" the rescue operation and its later insistence when Goodridge called that he keep the frequency clear, coupled with its failure to tell Captain Haggerty about Goodridge, could be found to have discouraged Goodridge from further attempts to communicate and so to assist the NORTHERN VOYAGER. The Coast Guard had a duty not to throw roadblocks in the path of Goodridge's independent efforts to help. A fact-finder might find that by announcing it was handling the rescue, and then that it needed to keep the frequency clear, the Coast Guard in effect declared exclusive control over rescue-related communications, leading Goodridge to forgo further efforts either to call the NORTHERN VOYAGER directly or to discuss salvage options with Coast Guard officers handling the rescue.

---

[16]The current version of the Coast Guard Addendum to the United States National Search and Rescue Supplement provides that "SMC's [i.e., Search and Rescue Mission Coordinator's] must remain familiar with all SAR assistance resources within the SMC's [area of responsibility] . . . and shall direct those resources that the SMC believes are needed to the scene of a vessel in distress." Coast Guard Addendum § 4.2.7.1. Commercial providers are an assistance resource. Id. at § 4.2.3.3. However, the National SAR manual and the Addendum do not define a standard of care owing to the public. See, e.g., In re American Oil Co., 417 F.2d 164, 170 (5th Cir. 1969); Daley, 499 F. Supp. at 1010.

The Coast Guard's comment about the need to keep the frequency clear came at a critical time when the decision whether to evacuate was under consideration. If Goodridge had not been discouraged from further contact at this time, before the evacuation, there is evidence suggesting the outcome could have been different. Had Captain Haggerty spoken to Goodridge or even been told by the Coast Guard he was on the way with a diver, he could have notified Goodridge that he wished his assistance. By itself, such an expression would likely have caused Goodridge to have increased and prolonged his efforts to reach and assist the sinking vessel. Further, communication could have allowed Goodridge to arrange with Captain Haggerty to dive under the vessel. Even if the Coast Guard still believed that safety considerations required Haggerty to leave the vessel before Goodridge could reach it, the captain stated in his affidavit that he could have taken steps to facilitate a dive before leaving by, for example, making sure to shut off the engines (and to assure Goodridge of the fact), and rigging a Jacobs ladder in order to facilitate a possible return to the vessel. Thus, a fact-finder could determine that even without Haggerty on board, a dive to plug the leak could have been arranged. Indeed, the record supports a possible inference that the first step, alone, would have been sufficient, and that if Goodridge had been engaged by Haggerty and had then simply been assured that the main engines were turned off,

he would have been willing to dive under the vessel and seek to plug the rudder tube, thereby checking the influx of water and quite possibly stabilizing the situation so as to permit further salvage efforts that would have ultimately saved the vessel.

A similar argument can be made based on Station Gloucester's unhelpful response to Goodridge on or about 10:47 a.m. when Goodridge contacted the station by radio hoping to get in touch with the captain. At this point, both Goodridge and the captain, who was by then on board the 47-foot Coast Guard vessel, were roughly one mile from the sinking NORTHERN VOYAGER. Station Gloucester first told Goodridge to call back by "land line" and, then, when Goodridge called by cellular phone, told him that he could speak to the captain back at the station. Captain Haggerty was not immediately informed of the call nor were efforts made to allow contact via the radio of the Coast Guard's vessel bearing Haggerty. A fact-finder could reasonably infer that the Coast Guard's response to Goodridge had the effect of interfering with the last opportunity to arrange for a dive. The only way in which Goodridge could have contacted the captain meaningfully once he was aboard the Coast Guard vessel would have been via the latter's radio. At 10:47 a.m., with both Goodridge and the captain not far from the scene, it remained possible that, had they spoken, Goodridge might still have taken effective measures to dive and

plug the leak.  Or, at least, the record suffices to raise a factual issue on this point.

In sum, we think the evidence, viewed in the light most favorable to appellants, was such that a reasonable fact-finder could conclude that the Coast Guard had reason to know that a third party was ready to give aid of a potentially useful type that the Coast Guard could not provide, and that it negligently engaged in actions that tended to prevent or disable such person from giving such aid.  Further, we think that a fact-finder could conclude from such evidence, viewed most favorably, that this negligence was a proximate cause of the sinking of the NORTHERN VOYAGER.  Under the circumstances, a remand for further proceedings is warranted.

It is true that under the Good Samaritan rule the appellants have the burden of demonstrating that the Coast Guard increased the risk of the NORTHERN VOYAGER's sinking over what it would have been had there been no Coast Guard involvement at all.  Arguably, appellants have not established that, absent the Coast Guard's pumping assistance, the NORTHERN VOYAGER would have stayed afloat for a sufficient time to permit Goodridge to reach it and effectively plug the leak, (i.e., that the loss of the NORTHERN VOYAGER could have been prevented by the private salvor, acting alone, had the Coast Guard not become involved).  However, according to plaintiffs' experts, there are various things that Captain Haggerty and his crew could have done to contain the

flooding temporarily and stabilize the situation, such as closing certain doors and making them watertight. While there is little or no evidence in the record that the captain and his crew actually did or thought of any of these things at the time of the emergency, there was evidence to suggest that at least one of the doors was not shut because of the presence of the hose of a Coast Guard pump. While the evidence is perhaps minimal that the ship would have survived until Goodridge could have saved it without help from the Coast Guard's pumps, we find it sufficient, viewed in the light most favorable to appellants, to establish a factual issue and warrant a trial on the question of whether the Coast Guard worsened the plight of the NORTHERN VOYAGER by its negative handling of Goodridge's attempts to become involved by radio.

## CONCLUSION

For the foregoing reasons, we affirm so much of the district court opinion as concluded that the Coast Guard's decision to forcibly evacuate the crew is protected by the discretionary function exception but remand for further proceedings on plaintiffs' claim that Coast Guard interference with communications between the commercial salvor and NORTHERN VOYAGER resulted in the sinking of the ship.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

**Opinion concurring in part and dissenting in part follows.**

-43-