COMPAGNIE MARITIME MARFRET; et al., Plaintiffs,

v.

SAN JUAN BAY PILOTS CORPORATION; et al., Defendants,

The United States of America, Third Party Plaintiff

v.

M/V Providence, her apparel, tackle, engines, appurtenances, etc., in rem, et al., Third Party Defendants.

Civ. No. 03–1654 (PG).

United States District Court, D. Puerto Rico.

Jan. 24, 2008.

---

Jorge F. Blasini–Gonzalez, Manolo T. Rodriguez–Bird, Jimenez, Graffam & Lausell, San Juan, PR, for Plaintiffs.

Michelle T. Delemarre, Joseph E. Kramek, U.S. Department of Justice, Civil Division, Aviation & Admiralty Litigation, Washington, DC, Miguel A. Fernandez–Torres, U.S. Attorney's Office, San Juan, PR, for U.S.A.

## OPINION AND ORDER

JUAN M. PÉREZ–GIMÉNEZ, District Judge.

The above-captioned claim is an admiralty action brought pursuant to the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 30901 *et seq.*, by plaintiffs Compagnie Maritime Marfret, Marseille Fret and the Underwriters Concerned (collectively "Plaintiffs"). Plaintiffs are the owners and operators of a vessel, and have sued the United States[1] for the damages sustained by their vessel after it was grounded while entering the San Juan Harbor. According to Plaintiffs' allegations, the grounding was due to the failure of the United States: (1) to properly position and maintain the aids to navigation that marked the entrance to the

---

1. Plaintiffs' amended complaint names as governmental defendants: (1) the United States Coast Guard, Department of Transportation, and (2) the United States Army Corps of Engineers ("USACE"). *See* Docket No. 29.

San Juan Harbor; (2) adequately warn mariners about inaccuracies in the position of these aids to navigation in the Bar Channel; and (3) properly notify mariners of the changes in the configuration of San Juan Harbor's Bar Channel.[2]

Before the Court now is the United States' Motion to Dismiss for Lack of Subject Matter Jurisdiction (Docket No. 124), to which Plaintiffs responded in opposition (Docket No. 139). The United States timely filed a Reply to Plaintiffs' Opposition (Docket No. 142), and Plaintiffs filed a Sur–Reply thereto (Docket No. 145). In the motions before the Court, the parties dispute whether the United States' actions fall within the "discretionary function exception" to the United States' statutory waiver of sovereign immunity. After careful consideration of the briefs and the evidentiary materials filed in support of the parties' arguments, this Court concludes that the United States' Motion to Dismiss is due to be **GRANTED.**

## I. STANDARD OF REVIEW

As an initial matter, we must determine the applicable standard of review, as it is also a matter in dispute among the parties. The United States argues that their request for dismissal pursuant to FED. R.CIV.P. 12(b)(1) should be considered a factual attack on the Court's subject matter jurisdiction, and thus, even though extrinsic materials have been submitted for the Court's consideration, the Court need not convert their motion to a motion for summary judgment. *See* Docket No. 124 at page 10, n. 5 (*citing Dynamic Image Technologies, Inc. v. U.S.,* 221 F.3d 34, 37–38 (1st Cir.2000) (conversion principle in Rule 12(b) does not apply to motions to dismiss under Rule 12(b)(1); the court,

without conversion, may consider extrinsic materials)). On the other hand, Plaintiffs contend that the United States' motion to dismiss should be treated as one for summary judgment under Fed.R.Civ.P. 56 because matters outside the pleadings have been submitted, and because the jurisdictional question in this case is intertwined with the merits of the case. Accordingly, Plaintiffs request that this Court apply the summary judgment standard, and view all evidence and make all inferences in the light most favorable to the non-moving party. *See* Docket No. 139 at pages 5–6. Nevertheless, the United States disagreed with Plaintiffs' argument in its reply asserting that the merits of this case involve navigation, whereas the issues raised in their motion to dismiss involve what they allege are "discretionary decisions related to federal waterway project design and management." *See* Docket No. 142 at pages 2–3. Let's see.

■■■ A claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the court lacks statutory or constitutional power to adjudicate on the merits of the claim. *See Roman v. Townsend,* 48 F.Supp.2d 100, 101 (D.P.R. 1999). In effect, Rule 12(b)(1) is the proper vehicle for challenging a court's subject matter jurisdiction. *Valentin v. Hospital Bella Vista,* 254 F.3d 358, 362–63 (1st Cir. 2001). Under this rule a variety of different types of challenges to the Court's subject matter jurisdiction may be asserted, among them those based on sovereign immunity, ripeness, mootness, and the existence of a federal question. *Id.* Rule 12(b)(1) motions may be considered as a "facial attack" or a "factual attack" on the allegations in the complaint. *See Vazquez*

---

**2.** The Court's diversity jurisdiction pursuant to 28 U.S.C § 1332 was also invoked because this is an action between citizens of a foreign state and citizens of the United States, and the amount in controversy exceeds $75,000. *See Amended Complaint,* Docket No, 29 at ¶ 2.

*v. Puerto Rico Police Dept.*, No. 01–2465, 2005 WL 2406170, at \*2 (D.P.R. September 29, 2005) (*citing Mortensen v. First Federal Sav. and Loan Ass'n*, 549 F.2d 884 (3rd Cir.1977)). "In a facial attack, a defendant argues that the plaintiff did not properly plead jurisdiction ... whereas a factual attack asserts that jurisdiction is lacking on the basis of facts outside of the pleadings." *Rivera Torres v. Junta de Retiro Para Maestros*, 502 F.Supp.2d 242, 247 n. 3 (D.P.R.2007) (internal quotation marks and citations omitted).

"Facial attacks on a complaint require the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in [plaintiff's] complaint are taken as true for purposes of the motion." *Torres–Negron v. J & N Records, LLC*, 504 F.3d 151, 162 (1st Cir.2007) (internal quotation marks and citations omitted). However, when a *factual attack* is made, the court is not confined to the allegations in the complaint and can look beyond the pleadings to decide factual matters relating to jurisdiction. *Rivera Torres*, 502 F.Supp.2d at 247 n. 3 (internal citations omitted). When a motion to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1) involves *factual questions*, the court must engage in a two-part inquiry. *Torres–Negron*, 504 F.3d at 162. First, the court must determine whether the relevant facts, which would determine the court's jurisdiction, also implicate elements of the plaintiff's cause of action. *Id.* at 163 (*citing Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir.1997)). Where the court finds that "the jurisdictional issue and substantive claims are so intertwined the resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment." *Torres–Negron*, 504 F.3d at 162 (*citing Autery v. United States*, 424 F.3d 944, 956 (9th Cir.2005)). In this situation, the trial court should grant the motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Torres–Negron*, 504 F.3d at 162 (internal citations omitted). Therefore, "[i]f the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point." *Id.*

However, if the trial court determines that the facts relevant to the jurisdictional inquiry are **not** intertwined with the merits of the plaintiff's claim, the court must apply the second part of the applicable test, and "may proceed as it never could under 12(b)(6) or [Federal Rule of Civil Procedure 56]." *Id.* (*citing Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. *Torres–Negron*, 504 F.3d at 162. Thus, in cases like this one, then, where the defendant makes a 12(b)(1) motion to dismiss, the parties should submit evidence, much as they would for a summary judgment motion, and the court should determine whether the dispute implicates the merits of the plaintiff's claim. *Id.*

As will be discussed *infra*, the First Circuit has held that the discretionary function exception has been implied into the SAA by analogy to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.

§§ 1346(b), 2671–2680.[3] *See Limar Shipping Ltd. v. United States*, 324 F.3d 1, 6–7 (*citing Gercey v. United States*, 540 F.2d 536 (1st Cir.1976)), According to the analysis utilized by sister courts, it is appropriate for cases under the FTCA to guide the application of the discretionary function exception under the SAA. *See, e.g., McMellon v. United States*, 387 F.3d 329, 349 (4th Cir.2004); *Arkansas River Co. v. U.S.*, 947 F.Supp. 941 (D.C.Miss.1996) (analysis of discretionary function exception is same under both SAA and FTCA). In cases involving the discretionary function under the FTCA, a number of courts have held that the determination of whether the FTCA excludes the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues. *See Pringle v. U.S.*, 208 F.3d 1220, 1223 (10th Cir.2000) (*citing Bell v. United States*, 127 F.3d 1226, 1228 (10th Cir. 1997)).[4]

In recent cases where the United States' immunity from suit pursuant to the discretionary function exception under the SAA was at issue, the District Court for the Middle District of Florida has held that the United States' request for dismissal shall be reviewed under the more stringent summary judgment standard. *See Capt. Chance, Inc. v. U.S.*, 506 F.Supp.2d 1196, 1200 n. 3 (M.D.Fla.2007) (motions shall be reviewed under summary judgment standard when motions address negligence of United States and comparative fault of Plaintiffs, and when determination of whether relevant statutes, regulations, and internal guidelines supply Coast Guard with discretion necessarily involve a discussion of nature of Coast Guard's duty and whether it breached its duty); *Insurance Co. of North America v. U.S.*, No. 804CV127T27MAP, 2005 WL 1500888, at *1 n. 1 (M.D.Fla. June 23, 2005).[5]

Similarly, this case involves the determination of whether the relevant statutes, regulations, and internal guidelines provide the United States' with discretion to act or not to act, rendering it, thus, immune from suit in accordance with the tenets of the discretionary function exception. Persuaded by the analysis employed by other courts, we hold that the United States' request for dismissal shall be reviewed under the summary judgment standard.

---

**3.** The FTCA provides a limited waiver of the federal government's sovereign immunity for claims of "injury or loss of property . . . caused by the negligent or wrongful act or omission of any employee of the Government . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

**4.** *But see Cottage v. U.S.*, No. 4:05 CV 2293, 2006 WL 2422895 (N.D.Ohio August 22, 2006) (in case where United States invoked discretionary function exemption under FTCA, trial court found that because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction, the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case).

**5.** *But see Simmons v. United States*, No. 300CV1316J99MMH, 2005 WL 1243760, at *5 n. 13 (M.D.Fla. May 25, 2005). In determining whether National Oceanic and Atmospheric Administration's ("NOAA") alleged acts and omissions fall within the discretionary function exception under the SAA in a claim arising out of charting of piling structures, the court found that issues raised by the NOAA's request for dismissal did not implicate the merits of Plaintiff's claims. The parties having submitted matters outside the pleadings, and the court having considered same, the court treated the motion to dismiss as a factual attack on subject matter jurisdiction.

## A. Summary Judgment Standard

A motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which allows disposition of a case if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Sands v. Ridefilm Corp.*, 212 F.3d 657, 660 (1st Cir.2000). A factual dispute is "genuine" if it could be resolved in favor of either party, and "material" if it potentially affects the outcome of the case. *Calero–Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir.2004).

To be successful in its attempt, the moving party must demonstrate the absence of a genuine issue as to any outcome-determinative fact in the record, *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997), through definite and competent evidence. *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994). Once the movant has averred that there is an absence of evidence to support the non-moving party's case, the burden shifts to the non-movant to establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990) (citations omitted). If the non-movant generates uncertainty as to the true state of any material fact, the movant's efforts should be deemed unavailing. *Suarez v. Pueblo Int'l*, 229 F.3d 49, 53 (1st Cir.2000). Nonetheless, the mere existence of "some alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At the summary judgment juncture, the Court must examine the facts in the light most favorable to the non-movant, indulging that party with all possible inferences to be derived from the facts. *See Rochester Ford Sales, Inc. v. Ford Motor Co.*, 287 F.3d 32, 38 (1st Cir.2002). "When doing so, however, we give no weight to conclusory allegations, unsupported conjecture, or free-wheeling invective." *Cordi–Allen v. Conlon*, 494 F.3d 245, 250 (1st Cir.2007).

In determining the appropriate standard of review, this Court must also note that the instant litigation is a non-jury case, that is, it would be bench-tried if necessary. *See* 46 U.S.C.A. § 30903(b) ("A claim against the United States or a federally-owned corporation pursuant to the provisions of the SAA shall be tried without a jury.") "In a nonjury case, such as this particular case, there is no jury to whom factual disputes are submitted; the judge is the ultimate finder of fact." *Richardson v. Oldham*, 811 F.Supp. 1186, 1193 (D.C.Tex.1992) (*citing In re Placid Oil Co.*, 932 F.2d 394, 397–398 (5th Cir.1991)). *See also Copelco Leasing Corp. v. Eyerman*, 855 F.Supp. 1049, 1056–1057 (D.C.Mo. 1994) ("Although disputed issues of fact are normally left for the jury to decide, there will be no jury involved with the disposition of this case. This Court will be both the factfinder and the ultimate determinator of legal issues."); *Pioneer Natural Resources USA, Inc. v. Diamond Offshore*, Civil No. 05–224, 2007 WL 3334388 at *2 (E.D.La. November 07, 2007) ("Where a jury is called for, the litigants are entitled to have the jury choose between conflicting inferences from basic facts but, where the judge is the trier of fact, he may be in a position to draw inferences without resort to the expense of trial, unless there is an issue of witness credibility.") "Therefore, at the summary judgment stage the judge has limited discretion to weigh the summary judgment

evidence and to draw inferences unless those inferences involve issues of witness credibility or disputed material fact." *Oldham*, 811 F.Supp. at 1193.

"In the case at hand, the parties have spent a considerable amount of time submitting an avalanche of materials in support of and in opposition to the summary judgment motions. Any factual disputes can and will be resolved with the extensive record now before the Court." *Copelco Leasing Corp.*, 855 F.Supp. at 1057.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiffs are companies organized and existing under the laws of France and are the co-owners/operators/underwriters of the M/V PROVIDENCE (the "Vessel" or "the PROVIDENCE"), a 16,252 gross tons, 179 meters long, French registered container vessel. *See Amended Complaint*, Docket No. 29, ¶¶ 15–17. The Vessel was scheduled to call in the Port of San Juan during the morning hours of June 17, 2002. Former co-defendant Freddy Soils [6] (hereinafter "Pilot Soils") was the compulsory pilot [7] assigned to provide the inbound pilotage service to the Vessel. Pilot Soils boarded the PROVIDENCE at 5:00 a.m. and undertook the navigation of the Vessel into the San Juan Harbor. Shortly thereafter, the Vessel ran aground, [8] and remained aground until approximately 12:15 p.m. According to his own deposition testimony, Pilot Soils did not bring a chart of the San Juan Harbor on board or consulted the chart that was aboard the PROVIDENCE while maneuvering the Vessel prior to the grounding. *See* Docket No. 139, Exhibit 34, at pages 216, 224.

Vessels entering the San Juan Harbor must pass through what is called the Bar Channel. The Bar Channel is maintained by the U.S. Army Corps of Engineers (hereinafter "the Corps" or "USACE"), and marked with aids to navigation by the U.S. Coast Guard. Prior to the grounding of the PROVIDENCE on June 17, 2002, the Corps had completed a dredging project ("the project") in the area of the entrance to the San Juan Harbor, including the Bar Channel. As part of the project, the federal navigation channels in the San Juan Harbor were reconfigured and made wider and deeper. *See* Docket No. 124,

---

**6.** The original Complaint was also filed against compulsory Harbor Pilot Freddy Solis, his wife, and the conjugal partnership between them; San Juan Bay Pilots Corporation; Harbor Holding and Operations Inc.; Harbor Pilot Stephen Rivera, his wife, and the conjugal partnership between them; and Navigators Insurance Company, as it concerned the potential liability of these co-defendants. However, on April 17, 2006, the Plaintiffs reached settlement of the claim against Pilot Solis and Navigators and all claims were dismissed against these co-defendants. *See* Dockets No. 133, 148, 149 & 151. The parties had also entered a Stipulation for Partial Dismissal of the claims against the other named co-defendants, which was approved by this Court through an Order issued on February 17, 2005. *See* Dockets No. 91 and 102.

**7.** Puerto Rico is a compulsory pilot jurisdiction whereby all alien ships or any ship of the United States navigating under registration are required to obtain the services of a pilot licensed by the Ports Authority before leaving or entering a harbor. *See Amended Complaint*, ¶ 19. *See also* P.R. LAWS ANN. tit. 23, § 2412; *Getty Refining & Marketing Co. v. Puerto Rico Ports*, 531 F.Supp. 396, 399 (D.P.R.1982).

**8.** Plaintiffs claim that the PROVIDENCE ran aground in the area of the entrance to the San Juan harbor, on the West side of the Bar Channel. *See Amended Complaint*, ¶ 22. However, the United States argues in its motion to dismiss that the Vessel ran aground outside of the Bar Channel, on a charted reef. *See* Docket No. 124–2 at page 7. We find this issue to be immaterial to the matter at hand.

Exhibit 1. The improved Bar Channel was marked with six floating buoys [9] and with fixed range lights [10]. The even-numbered buoys marked the west side of the channel, whereas the odd-numbered buoys marked the east side of the channel. It is undisputed that on March 22, 2002, Buoy No. 2 moved off-station, but was repositioned five days later, on March 27, 2002. Then, on April 10, 2002, Buoy No. 2 was again reported off-station, but this time was reset seventy-one days later, on June 20, 2002, three days after the grounding of the PROVIDENCE. It is also undisputed that, at the time of the grounding, the existing range lights did not mark the absolute center of the Bar Channel due to the Channel's reconfiguration by the Corps' dredging project.

Plaintiffs filed this action pursuant to the SAA contending that the United States: (1) failed to properly maintain the aids to navigation that marked the entrance to the San Juan Harbor, *see Amended Complaint,* ¶¶ 26, 45–46; (2) failed to properly warn mariners about inaccuracies in the position of the aids to navigation in the Bar Channel, *id.* at ¶¶ 26, 46; (3) did not provide adequate warning with regards to the changes in the configuration of the San Juan Harbor's Bar Channel, *id.* at ¶¶ 27, 43–44; and (4) failed to adequately position the aids to navigation (buoys and range light) in the reconfigured Bar Channel, *see id.* at ¶¶ 30–31, 43. The United States denies Plaintiffs' allegations, and asserts, in its request for dismissal, that this Court lacks jurisdiction over this action because the challenged governmen-

9. The Light List defines the term "buoy" as follows:

> Buoys are floating aids to navigation used extensively throughout U.S. waters. They are moored to the seabed by concrete sinkers with chain or synthetic rope moorings of various lengths connected to the buoy body. *Buoy positions represented on nautical charts are approximate positions only,* due to the practical limitations of positioning and maintaining buoys and their sinkers in precise geographical locations. Buoy positions are normally verified during periodic maintenance visits. Between visits, atmospheric and sea conditions, seabed slope and composition, and collisions or other accidents may cause buoys to shift *from their charted locations, or cause buoys to be sunk or capsized.*
> Buoy moorings vary in length. The mooring lengths define a *watch circle,* and buoys *can be expected to move within this circle.* Actual watch circles do not coincide with the symbols representing them on charts. CAUTION: ... Mariners must not rely on buoys alone *for determining their positions* due to factors limiting buoy reliability. Prudent mariners will use bearings or angles from fixed aids to navigation and shore objects, soundings and various methods of electronic navigation to positively fix their position.

*See* Docket No. 124, Exhibit 2: *Light List, Volume III, Atlantic and Gulf Coasts* (2001), page viii (emphasis ours). *See also* 33 C.F.R. § 62.23(c). According to the Code of Federal Regulations, the Light List is one of the publications that all navigators should consult for the safe navigation of vessels. *See* 33 C.F.R. § 62.21(c). The Light List is a publication by the Coast Guard that lists federal and private aids to navigation. "It includes all major Federal aids to navigation and those private aids to navigation, which have been deemed to be important to general navigation, and includes a physical description of these aids and their locations." *Id.* The remaining list of publications that all navigators are advised to consult includes: the United States Coast Pilot, Local Notices to Mariners, the Notice to Mariners and Broadcast notices to Mariners. *Id.*

10. "Ranges are non-lateral aids to navigation systems employing *dual beacons which when* the structures appear to be in line, assist the mariner in maintaining a safe course. The appropriate nautical chart must be consulted *when using ranges to determine whether the* range marks the centerline of the navigable channel and also what section of the range may be safely traversed...." *See* Docket No. 124, Exhibit 2: *Light List, Volume III, Atlantic and Gulf Coasts* (2001), page xxiii (emphasis ours).

tal conduct falls within the discretionary function exception to the statutory waiver of sovereign immunity under the Suits in Admiralty Act. *See* Docket No. 124.

## III. APPLICABLE LAW AND ANALYSIS

### A. Discretionary Function Exception

"The United States, as sovereign, is immune from suit except as it consents to be sued, and the terms of its consent define the federal courts' jurisdiction over suits against the United States." *Thames Shipyard and Repair Co. v. U.S.*, 350 F.3d 247, 253 (1st Cir.2003) (*citing United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). In the Suits in Admiralty Act, the United States waives its sovereign immunity from suit in cases in which, "if a vessel were privately owned or operated, . . ., a civil action in admiralty could be maintained . . . against the United States or a federally-owned corporation." *See* 46 U.S.C.A. § 30903. Although not expressly contained in the SAA, the First Circuit has held that the SAA is subject to the discretionary function exception, which is expressly stated in the Federal Tort Claims Act.[11] *See Thames Shipyard and Repair Co.*, 350 F.3d at 254 (*citing Limar Shipping Ltd.*, 324 F.3d at 6–7 & n. 3).

■ "The purpose of the discretionary function exception is to insulate certain governmental actions and decisions based on considerations of public policy from tort liability by private individuals." *Thames Shipyard and Repair Co.*, 350 F.3d at 254. "The basis for the discretionary function exception was Congress' desire to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *Berkovitz v. United States*, 486 U.S. 531, 536–537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (*quoting United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537, 108 S.Ct. 1954.

■ In *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the Supreme Court articulated a two-part test to determine whether the challenged conduct falls within the discretionary function exception. First, the court must determine whether the challenged conduct involves an element of judgment or choice. *Id.* at 322. This first requirement is not satisfied if "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, because the employee has no rightful option but to adhere to the directive." *Id.* (*citing Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954) (internal quotation marks omitted). *See also Thames Shipyard and Repair Co.*, 350 F.3d at 254 ("This Court has declared that conduct is non-discretionary if a federal statute, regulation, or policy specifically instructed federal officials to follow a specified course of action.") "Second, the court must determine whether that judgment is of the kind that the discretionary function was designed to shield, meaning that it involved governmental actions and decisions based on considerations of public policy." *Id.* (internal quotations

---

11. The discretionary function exception, as contained in the FTCA, states, in relevant part, that the government will not be liable for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

marks and citations omitted); *see also Gaubert*, 499 U.S. at 322–323, 111 S.Ct. 1267 (*citing Varig Airlines*, 467 U.S. at 813, 104 S.Ct. 2755).

■ When a Court finds that a regulation allows the employee discretion, "the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Limar Shipping Ltd.*, 324 F.3d at 8 (*citing Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). "Plaintiff bears the burden of rebutting this presumption and demonstrating that the conduct at issue is not policy-based." *Limar Shipping Ltd.*, 324 F.3d at 8 (internal citations omitted). "This presumption cannot be overcome by evidence that the government did not actually weigh the relevant policy considerations in making the challenged decisions." *Marbulk Shipping Inc. v. Martin–Marietta*, 271 F.Supp.2d 1374, 1379 (S.D.Ala. 2003) (internal citations omitted). In fact, "it is not relevant whether the government employee in fact made a policy judgment The inquiry is whether the nature of the conduct at issue is susceptible to policy analysis." *Ochran v. U.S.*, 117 F.3d 495 (11th Cir.1997) (*citing Autery v. U.S.*, 992 F.2d 1523, 1530–31 (11th Cir.1993); *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267).

## B. Applicability of the Discretionary Function Exception

■ As stated by the First Circuit in *Thames Shipyard and Repair Co.*, 350 F.3d at 254, "the court must initially identify the conduct that allegedly caused the harm." After an assiduous review of the complaint and the record before the Court, we conclude that Plaintiffs allege that the following conduct on the part of the United States purportedly lead to the grounding of the Vessel and the resulting damages:

1. Unsuitable positioning of the aids to navigation in the improved bar channel;

2. Inadequate provision of notice to mariners of the changes to the configuration of the San Juan Harbor;

3. Improper maintenance of the aids to navigation; and,

4. Inadequate warnings with respect to discrepancies in the aids to navigation in the San Juan Bar Channel.

We will in turn apply the two-prong test set forth in *Gaubert* to determine whether the discretionary function exception applies.

## 1. Position of Aids to Navigation in Improved San Juan Bar Channel

In their amended complaint. Plaintiffs allege that the buoys placed by the Coast Guard in the reconfigured Bar Channel created a wrong perception with regards to the western edge of the channel. *See* Amended Complaint, ¶¶ 29–30. They also allege that the range markers did not mark the center of the Bar Channel, and thus, did not assist in the safe entrance and departure of vessels into the San Juan Harbor. *Id.* at ¶ 31. The Unites States moves to dismiss Plaintiffs' claims regarding the design of the aids to navigation system in the Bar Channel, as these decisions are discretionary and susceptible to policy analysis, and thus, are sheltered by the discretionary function exception. *See* Docket No. 124 at pages 13–14.

In their opposition, however. Plaintiffs argue that the discretionary function exception does not apply when the Coast Guard assumes a duty to place various aids to navigation in an area, but does so negligently, or in an incomplete manner, and fails to adequately mark the areas in question. Plaintiffs challenge several decisions of the Coast Guard in marking the im-

proved Bar Channel. Specifically, Plaintiffs argue that the United States was negligent in placing Buoys No. 2, 4, and 6 too close to the western ledge of the Bar Channel and in using long chains to moor them.[12] According to Plaintiffs, the lengthy chains caused the buoys to float into shallow water, and over foul ground as well. Additionally, Plaintiffs argue that, prior to the project, the Bar Channel buoys had been placed in-line and opposite to each other. However, as part of the reconfiguration of the Bar Channel, Plaintiffs contend that the United States negligently positioned Buoys No. 4 and 6 in a "joggled fashion," rather than a straight line. Finally, Plaintiffs claim that the United States failed to relocate the range lights so that they marked the new center of the reconfigured Bar Channel.

Under the applicable test set forth in *Gaubert,* this Court must first determine whether the challenged conduct involves an element of judgment or choice, *see Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267, thus, we commence with an overview of the statutory provisions pertaining to the marking of obstructions in navigable waters. Pursuant to 14 U.S.C. § 81, "[i]n order to aid navigation and to prevent disasters, collisions, and wrecks of vessels . . . the Coast Guard *may* establish, maintain, and operate . . . aids to maritime navigation. . . ." 14 U.S.C. § 81 (emphasis ours). Therefore, the Coast Guard has no duty to establish an aid to navigation and cannot be held liable for failing to do so. *See Chute v. U.S.,* 610 F.2d 7, 11 (1st Cir.1979). Additionally, 14 U.S.C. § 86 provides that: "[t]he Secretary [of Transportation] *may* mark for the protection of navigation any sunken vessel or other obstruction existing on any navigable waters of the United States *in such manner and for so long as, in his judgment,* the needs of maritime navigation require." 14 U.S.C. § 86 (emphasis ours). In accordance with the latter, the First Circuit has held that the Coast Guard's executive discretion in choosing whether or not to mark submerged wrecks or obstructions, and what navigational aids to employ must, in

12. With regard to Buoy No. 4 in particular, this Court is confused as to what exactly is Plaintiffs' stand on the matter. On the one hand, Plaintiffs argue that the United States had knowledge that Buoy No. 4 did not *properly* mark the western edge of the Channel. They specifically cite to a study—the PAWSA Follow-up After Action Report of May 15, 2002—in which it was recommended that Buoy No. 4 be placed more to the center of the channel. *See* Docket No. 139, Exhibit 20. The United States points out in its reply, that "the PAWSA report referenced by plaintiffs does not establish that the buoy was off-station. It only shows that the people participating in the study thought that the buoy should be in a different location. The Coast Guard, in its discretion, could accept or reject this suggestion." We agree. Plaintiffs have simply failed to show that the conclusions of this report were binding, or prescribed a mandatory course of action to the Coast Guard.

On the other hand, Plaintiffs also argue that Buoy No. 4 was *out of position.* To that extent, Plaintiffs submitted an excerpt of the deposition of Pilot Soils in which he declares that Buoy No. 4 was 100 ft. west of its actual position. *See* Docket No. 139, Exhibit 34 at page 177. (The Court notes that on that same page, Pilot Solis also declared the following: "I was giving orders which were not taken by the Master of the Vessel. If he would have followed my instructions, nothing would have . . . (end of page).") *Id.* Nevertheless, the United States submitted a document showing the results of an official check of the existing navigational aids performed by the Coast Guard shortly after the grounding of the PROVIDENCE. After this inspection, the Coast Guard recorded that Buoy No. 4 was on-station and working properly. *See* Docket No. 142, Exhibit 25. We find that this issue of fact is immaterial because Plaintiffs fail to show that the Coast Guard knew that Buoy No. 4 was off-station. The Coast Guard simply cannot warn mariners of conditions it is unaware of.

all ordinary cases, be final. *See Chute,* 610 F.2d at 13.

■ An agency's internal guidelines are relevant to the discretionary function analysis. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. Plaintiffs here contend that the Coast Guard's decisions in marking the improved Bar Channel disregarded the provisions of the Aids to Navigation Manual (hereinafter "ATON Manual"), which they purport contains the requisite policies and guidelines for positioning aids to navigation.[13] On the other hand, the United States argues that the language of the ATON Manual's provisions hardly establish a fixed or readily ascertainable standard necessary to defeat the application of the discretionary function exception.[14] In a case before the Eleventh Circuit Court of Appeals, the government set forth a similar argument to that of defendant here, and the court agreed stating:

> The Aids to Navigation Administration Manual (ATON Manual), which contains internal guidelines of the Coast Guard regarding the marking of wrecks, states that "the Coast Guard retains the discretion to deviate or authorize deviation from" its "requirements." The ATON Manual creates "no duties or obligations to the public to comply with the procedures" described in it, and the ATON Manual states that "no member of the public should rely upon the[ ] procedures as a representation by the Coast Guard as to the manner of performance of [the] aids to navigation mission." The Melechs and Cranford fail to identify " 'a federal statute, regulation, or policy [that] specifically prescribes a course of action embodying a fixed or readily ascertainable standard.' "

*Cranford v. U.S.,* 466 F.3d 955, 959 (11th Cir.2006) (internal citations omitted). We agree with the Eleventh Circuit's assessment in finding that "the excerpts from the ATON Manual on which Plaintiffs rely do not supply fixed or readily ascertainable standards necessary to defeat the application of the discretionary function exception. Rather, the relevant standards preserve in the Coast Guard elements of judgment and choice." *Capt Chance, Inc. v. U.S.,* 506 F.Supp.2d 1196, 1202 (M.D.Fla.2007). *See also Smith v. U.S.,* 251 F.Supp.2d 1255, 1260 (D.Md.2003) (the court finds an element of judgment or choice to be present in the guidelines set forth in the Coast Guard's Aids to Navigation Manual). Thus, the first part of the *Gaubert* test is satisfied insofar as the challenged conduct involves an element of judgment or choice, and the relevant federal statutes, regulations, and policies do not prescribe a course of action that the

---

**13.** "[T]he United States did not follow the guidelines in the Aids to Navigation Manual. The purpose of the Manual, is to promulgate policy and guidance for positioning of aids to navigation. Said Manual states on the very first page (Exhibit 21, page 1–1) that the objective of placing an aid at a specific geographic location is secondary to ensuring the aid's actual location marks good water and serves the purpose for which it was intended." *Plaintiffs' Opposition,* Docket No. 139 at page 39 (internal quotation marks omitted).

**14.** The United States also cites to the first page of the ATON Manual which provides: "This manual is intended only for the internal guidance of personnel involved in positioning Coast Guard aids to navigation. The high expectations of performance contained in this manual are intended to encourage public service above and beyond the minimum threshold of 'due care.' Any requirements or obligations created by this manual flow only from those involved in the Coast Guard aid positioning to the Coast Guard, and the Coast Guard retains the discretion to deviate or authorize deviation from these requirements." *See Reply,* Docket No. 142 at page 16; *see also Plaintiffs' Opposition,* Docket No. 139, Exhibit 21.

employee has no rightful option but to adhere to.

We now turn to the second part of the *Gaubert* test and consider whether these decisions were of the type the discretionary function exception was designed to shield. As previously mentioned, "where a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Limar Shipping Ltd.*, 324 F.3d at 8 (*citing Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267). "Plaintiff bears the burden of rebutting this presumption and demonstrating that the conduct at issue is not policy-based." *Limar Shipping Ltd.*, 324 F.3d at 8 (internal citations omitted).

Here, the Plaintiffs have failed to meet their burden. In their opposition, Plaintiffs have not even addressed the second prong of the discretionary function inquiry, which focuses on whether the challenged governmental actions and decisions were based on considerations of public policy. On the other hand, the United States has persuasively explained that "[p]lacing aids to navigation necessarily requires the exercise of discretion in choosing their location, number, type, size, and operational characteristics." *See* Docket No. 124 at

page 16. "These decisions are grounded in social and economic policy considerations because they require determinations as to which aids will best suit the needs of society and maritime commerce, while contemporaneously balancing the expenditure of federal funds." *Id.* We agree.

The United States Supreme Court has recognized that decisions aimed at maximizing efficient use of resources are policy-based. *See Limar Shipping Ltd.*, 324 F.3d at 9 (*citing Varig Airlines*, 467 U.S. at 820, 104 S.Ct. 2755 (recognizing the efficient allocation of agency resources as a policy choice)). Moreover, courts in this circuit and others have found that the United States has satisfied both prongs of the discretionary function exception inquiry under similar circumstances.[15] Thus, persuaded by the defendant's argument, as well as the analysis employed by other courts, we find that the Coast Guard's decisions on how to design the aids to navigation system in the improved Bar Channel are susceptible to policy analysis, thereby satisfying the second prong of the discretionary function inquiry.

In light of the foregoing, we find that the Coast Guard's decisions in designing and marking the improved San Juan Bar Channel satisfy both prongs of the *Gaubert* test, and with that, fall within the discretionary function exception.

---

**15.** *See, e.g., Chute v. United States,* 610 F.2d 7 (1st Cir.1979), cert. denied, 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) (holding that a Coast Guard's decision to mark a sunken wreck with a small buoy, instead of a larger buoy, fell within discretionary function exemption); *Lawson v. United States,* 1997 WL 530540 at \*3 (6th Cir. Aug. 27, 1997, (unpublished) (selection of the number and location of navigation aids is a discretionary function that falls outside the Suits in Admiralty Act under the discretion function exception)); *Cranford v. U.S.,* 466 F.3d 955 (11th Cir.2006) (holding that Coast Guard had broad discretion in deciding how to mark a

wreck, and decisions in marking wreck involved social, political, and economic policy considerations, such as taking into account the knowledge and customs of international mariners, balancing the needs of pleasure and commercial watercraft, and evaluating agency resource constraints); *Alabama Elec. Co-op., Inc. v. U.S.,* 769 F.2d 1523, 1536–1537 (11th Cir.1985)(holding that where the Corps makes a social, economic or political policy decision concerning the design of a particular project, that decision is excepted from judicial review under the discretionary function exception).

## 2. Warnings to Mariners of Changes to San Juan Bar Channel

In their amended complaint, Plaintiffs allege that the United States failed to provide adequate warning with regards to the changes in the configuration of the San Juan Harbor Bar Channel. *See* Docket No. 29, ¶¶ 27, 43–44; Docket No. 139 at page 3. These so-called "dangers" include: the steep edges of the new Channel, specifically the rock ledge on the western edge of the Bar Channel, and the fact that the range lights no longer marked the centerline of the channel. *See* Docket No. 139 at page 41. Plaintiffs concede, however, that these conditions were generally advertised to the local maritime community only through an "information bulletin," not a Notice to Mariners. *Id.* Moreover, Plaintiffs contend that the United States did not issue a chart overlay to reconcile all the changes made in the Bar Channel, including the new channel limits, with the old edition of the Chart for San Juan Harbor, the 40th Edition of the NOAA Chart No. 26570.11. *Id.* at page 13.

In their motion to dismiss, the United States evinced that the relevant government agencies took a series of steps to inform mariners of the changes to the San Juan Bar Channel. On January 8, 2002, the Coast Guard issued a Local Notice to Mariners [16] ("LNM") warning the following:

> Numerous significant changes to the aids to navigation in the approach to San Juan, Puerto Rico will be made during the week beginning January 14, 2002. These changes include but are not limited to major position changes and renumbering due to realignment of the channels. Changes to these aids will be available in Local Notice to Mariners 03–02 dated January 15, 2002, which can be accessed online at *http://www.navcen. uscg.gov/lnm/d7.* Mariners are urged to pay particular attention to all Broadcast Notice to Mariners and use extreme caution while transiting this area.

*See* Docket No. 124, Exhibit 3. This notice was repeated in the LNM's of January 15 and January 22 of 2002. *See* Docket No. 124, Exhibits 4 & 5. Some time in January

---

**16.** According to the Code of Federal Regulations, Local Notices to Mariners should be consulted by all navigators. These are published by local Coast Guard District Commanders and pass information affecting navigation safety. "Changes to aids to navigation, reported dangers, scheduled construction or other disruptions, chart corrections and similar useful marine information is made available through this publication." *See* 33 C.F.R. § 62.21.

The Light list also defines the term as follows:
Local Notice to Mariners (U.S. regional coverage) are another means by which the Coast Guard disseminates navigation information for the United States, its territories, and possessions. A Local Notice to Mariners is issued by each Coast Guard district and is used to report changes to, and deficiencies in, aids to navigation maintained by and under the authority of the Coast Guard. Local Notices to Mariners contain

other marine information such as, channel depths, naval operations, regattas, etc., which may affect vessels and waterways within the jurisdiction of each Coast Guard district. Reports of channel conditions, obstructions, menaces to navigation, danger areas, new chart conditions, etc., are also included in the Local Notices to Mariners. *These notices are essential to all navigators for the purpose of keeping their charts, light Lists, Coast Pilots and other nautical publications up-to-date.* These notices are published as often as required, but usually weekly. They may be obtained free of charge, by making application to the appropriate Coast Guard district commander. . . . *Vessels operating in ports and waterways in several districts will have to obtain the Local Notice to Mariners from each district in order to be fully informed.*
*See* Docket No. 124, Exhibit 2: *Light List, Volume III, Atlantic and Gulf Coasts* (2001), page viii (emphasis ours).

of 2002, the Coast Guard issued a "Marine Safety Information Bulletin," which was distributed via e-mail to the San Juan Bay Pilots, notifying mariners that the buoys in the Bar Channel would be repositioned due to the completion of the Corps' dredging project. The bulletin included a table with the buoys' new positions and a graphical display of the improved Bar Channel. It also notified the pilots of the following:

Please note that the representations of the channel edges on the drawing are based on data from the Army Corps of Engineers, but do not necessarily represent the exact limits of the dredging. The mariner is advised to use caution while transiting near the limits of the dredging project, as the bottom curvature is very steep; depths decrease very quickly outside the new channel.

*See* Docket No. 124, Exhibits 6 & 7. The graphical display also noted that a new range lights would be installed later. *Id.* Some days later, on January 29, 2002, the Coast Guard published another LNM informing mariners of the new position and characteristics of Buoys No. 1–3 and 5–11. *See* Docket No. 124, Exhibit 8. Thereafter, on February 12, 2002, mariners were informed of the new positions of Buoys No. 9 & 11 in another LTM. *See* Docket No. 124, Exhibit 9.

Weekly Notices to Mariners ("WNTM"),[17] as opposed to Local Notices to Mariners, were also published prior to the grounding of the PROVIDENCE. On April 20, 2002, a Notice to Mariners was issued notifying the changes to the characteristics and locations of the buoys in the San Juan Harbor. *See* Docket No. 124, Exhibit 11. Then, on May 25, 2002, a table depicting the new controlling depths of the San Juan Channel was published in another WNTM. *See* Docket No. 124, Exhibit 12. Said table contained a warning that read: "Note–Consult the Corps of Engineers for changes subsequent to the above information." *Id.*

With regards to the publication of a new edition of the chart depicting the Harbor, the United States has set forth proof in its motion to dismiss that on May 21, 2002— almost a month prior to the grounding of the Vessel—the Coast Guard had issued a LNM announcing the publication of a new edition. *See* Docket No. 124, Exhibit No. 13. According to the LNM, this new edition, the 41st Edition of Chart No. 25670, was released due to the numerous changes the Bar Channel had undergone, which had been published in previous notices to mariners. *Id.* Nonetheless, Plaintiffs complain that the new chart was "formally" advertised to the international maritime community in a Weekly Notice to Mariners on June 29, 2002, almost two weeks after the grounding. *See* Docket No. 139 at page 13 (*citing* Docket No. 124, Exhibit 14). In addition, Plaintiffs cite to the deposition transcripts of officers of the local Coast Guard Office, members of the pilotage commission and compulsory harbor pilots in support of the proposition that this new chart was not available at the time of the grounding.

---

17. Another publication a navigator should maintain and consult to assist in the navigation of vessels is the Weekly Notice to Mariners. 33 C.F.R. § 62.21(c). "The Notice to Mariners is a national publication, similar to the Local Notice to Mariners, published by the National Imagery and Mapping Agency. The notice may be obtained free of charge ... upon request.... This publication provides ocean going vessels significant information on national and international navigation and safety." *Id.* According to the Light List, "[t]he Weekly Notices to Mariners advise mariners of important matters affecting navigational safety including new hydrographic discoveries, changes in channels and aids to navigation. Also included are corrections to Light Lists, Coast Pilots, and Sailing Directions." *See* Docket No. 124, Exhibit 2.

First of all, all Notices to Mariners are "formal" announcements, whether they are Local or Weekly. Second, having reviewed the deposition testimony submitted as exhibits to Plaintiffs' opposition, we find that their proposition is unfounded. What these officers *do* testify during their depositions, which were taken two to three years after the grounding of the Vessel, is that they do not recall whether or not the 41st Edition of Chart No. 25670 was available prior to the grounding, and that even if it was, they did not need one because they had plotted the changes to the San Juan Harbor on the 40th Edition in accordance with the announcements made in previous notices to mariners. *See* Docket No. 139, Exhibit 31: *Deposition of Coast Guard Investigation Officer Quinones* at page 95; Exhibit 32: *Deposition of Coast Guard Officer Jess Lopez* page 46; Exhibit 34: *Pilot Soils' Deposition* at page 216.

Now, moving on to the applicable discretionary function exception analysis set forth in *Gaubert,* we must first determine whether the challenged conduct involves an element of judgment or choice. *See Gaubert,* 499 U.S. at 322, 111 S.Ct. 1267. As previously mentioned, an agency's internal guidelines are relevant to this analysis. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267. Plaintiffs here place primary reliance on the provisions contained in the Corps Regulation ER 1130–2–520, entitled "Aids to Navigation, Navigation Charts, and Related Data." It is Plaintiffs' contention that this regulation promulgates the requisite policies and guidelines for publishing changes or corrections to chart data and aids to navigation, as well as information related to Corps' waterway projects. Plaintiffs argue that the Corps never issued a chart overlay that reflected the changes to the San Juan Harbor, thus violating Corps Regulation ER 1130–2–520.

After a reading of the attached excerpt of the Corps Regulation, we find that Plaintiffs' interpretation is simply wrong. The section of the regulation cited by Plaintiffs clearly states that the issuance of a chart overlay is only required in cases where there's a change or a correction to a chart depicting *inland* waterways, *see* Docket No. 142, Exhibit 32. Contrary to what is set forth by Plaintiffs, this requirement is evidently inapplicable to a waterway such as the San Juan Harbor. The only article of the Corps Regulation that is relevant to the case at hand states as follows:

> MSC/District commanders *shall* cooperate in dissemination of operational navigation notices and marine information to the marine industry, the public, and other government agencies through notices and special reports/notifications:
>
> (1) The principal mechanisms for disseminating operational navigation information to industry and to mariners *shall be* USCG broadcasts and publications (Broadcast and Local Notices to Mariners, Light List) and NOS publications (coastal navigation charts, U.S. Coast Pilot). In cases where these are appropriate, the USACE shall provide information to the responsible agencies and minimize redundant publication of separate navigation information.
>
> (2) MSC/district commanders *shall use* bulletins or NTNI [Notice to Navigation Interests] for corrections and updates to Corps charts, changes in USACE navigation regulations, proposed/planned changes to a navigation project, and in cases where Notices to Mariners or other publications may not be appropriate or adequate....

*See* Docket No. 142, Exhibit 32 (emphasis ours). A simple reading allows us to infer that neither paragraph establishes a fixed standard mandating the Corps to issue

warnings. The first paragraph is merely a pronouncement encouraging cooperation in the dissemination of notices and marine information to the marine industry, the public, and government agencies. Furthermore, the words "[i]n cases. where these are appropriate" in the second paragraph and "may not be appropriate or adequate" in the third paragraph require judgment in deciding whether USCG broadcasts and publications, as opposed to bulletins or NTNI, are the most adequate form of disseminating navigation information to the maritime industry. Rather than establishing fixed directives, the relevant standards preserve in the Corps elements of judgment and choice. *See Dunaway v. U.S.,* 136 F.Supp.2d 576 (E.D.La. 1999) (holding that Corps Regulation ER 1130–2–520 does not establish a fixed standard, on the contrary, preserves elements of judgment or choice). In addition, Plaintiffs point to no specific regulation that mandates what must be the content of the Corps' or the Coast Guard's warnings regarding changes to the configuration of a navigational waterway or to navigational aids. In light of the foregoing, we find that the first part of the *Gaubert* test is satisfied insofar as the challenged conduct involves an element of judgment or choice, and the relevant federal statutes, regulations, and policies do not prescribe a course of action that the employee *must* adhere to.

The second requirement of the *Gaubert* test, that the judgment is the type the discretionary function was designed to protect, is also satisfied with regards to the Corps' and the Coast Guard's decisions. The First Circuit has ruled that the allocation of resources for the production and dissemination of ocean charts by a budget-constrained entity is a policy decision that falls within the ambit of the discretionary function exception. *See Limar Shipping Ltd.,* 324 F.3d at 10. "Allocation of re-

sources and budget management involve prioritizing and are quintessentially policy-based choices." *Id.* (internal citations omitted). Given the applicability of the discretionary function exception, we find that, under the facts of the instant case, the United States has not waived sovereign immunity and cannot be subjected to suit in this matter. *See id.*

Besides the foregoing, Plaintiffs acknowledge that an information bulletin and several Local and Weekly Notices to Mariners were issued advising mariners of the changes to the navigational aids and the configuration of the Bar Channel. Neither do they deny that a LNM was released announcing the publication of a new edition of the relevant chart prior to the grounding of the Vessel. Therefore, insofar as the Corps and the Coast Guard complied with the relevant directives, the discretionary function applies. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267 (holding that if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected).

### 3. Maintenance of aids to navigation

In their complaint. Plaintiffs allege that the Coast Guard was negligent in maintaining the aids to navigation in their proper position, discover discrepancies in their position and promptly take measures to correct these discrepancies. *See* Docket No. 29, ¶¶ 26, 45. Specifically, Plaintiffs complain that Buoy No. 2 was off-station for an unreasonable amount of time, and that this condition was a factor in the grounding of the Vessel. *See id.* at ¶¶ 28, 47. Citing to a sworn statement from former Chief of the Aids to Navigation Division for the Seventh Coast Guard District Larry Jaeger, the United States submits that it did not have the available resources to reposition a heavy buoy such

as Buoy No. 2 any sooner than it did.[18] Plaintiffs oppose the United States' contentions arguing that a temporary buoy should have been placed and that the Coast Guard failed to exhaust all available resources or methods in the repositioning of Buoy No. 2.[19] *See* Docket No. 139 at pages 21–23, 35–40. Plaintiffs also argue that, in the case of discrepant aids, "there are specific internal guidelines which require that the Coast Guard take action within a determined time frame." *See* Docket No. 139 at page 36. Plaintiffs rely on the Coast Guard's "Discretionary Response Decision Guide" as grounds for their contention that Buoy No. 2 should have been returned on-station within a period of seventy-two hours. *See* Docket No. 139, Exhibit 12. Once again, we disagree with Plaintiffs as we shall explain forthwith.

The relevant regulations in the matter at hand state:

(f) Although aids to navigation are maintained to a reasonable degree of reliability, the rigors of the marine environment and various equipment failures do cause discrepancies on occasion.

(g) The Coast Guard makes *reasonable* efforts to inform the navigator of known discrepancies, and to correct them within a *reasonable* period of time, depending upon resources available. Occasionally, a temporary aid to navigation, which provides different but similar service, is deployed until permanent repairs can be made to the original aid. Notification of such temporary changes is made through the notice to mariners system.

33 C.F.R. § 62.21 (emphasis ours).

The Coast Guard cannot monitor the many thousands of aids in the U.S. Aids to Navigation System simultaneously and continuously. As a result, it is not possible to maintain every aid operating properly and on its charted position at all times.

33 C.F.R. § 62.65(b). Clearly, the above-cited federal statutes recognize that forces of nature, equipment failures, and resource constraints will prevent the Coast Guard from being able to maintain all aids to navigation in their charted positions at all times. Moreover, the term "reasonable" contained therein preserves in the Coast Guard elements of judgment and choice as to what it will deem a "reasonable effort" and a "reasonable period of time" to be whenever a discrepant aid is reported or found.

In addition, Plaintiffs' reliance on the Coast Guard's "Discrepancy Response Decision Guide" in support of their contention that the Coast Guard should have returned Buoy No. 2 on-station within a determined time frame is misguided. Specifically, the guide states that when a buoy of Buoy No. 2's priority level is reported off-station, the "[s]ervicing unit shall respond within 72

---

**18.** Citing to a sworn statement by Coast Guard Larry Jaeger, the United States explains that shortly after the MADRONA, the Coast Guard sea-going buoy tender, repositioned the buoys in the Bar Channel in January of 2002, it was de-commissioned for an estimated period of one year. During this one-year period, there was no other sea-going buoy tender available. Thereafter, on April 2002, a 55–foot aids to navigation boat began a 6–week overhaul after which the aids to navigation team would undertake the resetting of Buoy No. 2. *See* Docket No. 124, *Coast*

*Guard Larry Jaeger Sworn Statement,* Exhibit No. 15.

**19.** Specifically, Plaintiffs argue that the Coast Guard could have reset Buoy No. 2 using two other cutters that were stationed in Florida and that could have arrived in three days. Plaintiffs also claim that the repairs being done to the aids-to-navigation boat servicing the Coast Guard district of Puerto Rico did not preclude the boat's immediate use.

hours after receipt of discrepancy report or as soon thereafter as weather and resources permit." *See* Docket No. 139, Exhibit 12. As the sister court of the District of Maryland has wisely concluded, the language of this guide simply does not amount to the requisite fixed or readily ascertainable standard:

> Discrepancy Response Decision Guide, as a part of the internal regulations of the Coast Guard (contained in the Coast Guard's Aids to Navigation Manual) that are distinct from federal regulations having the force of law, do not prescribe a specific course of action. The guidelines indicate only the priority for corrective action to be assigned to a given discrepancy; they leave decisions about what the corrective action will be, the actual method of correction (i.e., permanent or temporary measures), and, to the extent that the guidelines recognize that weather or resource constraints may preclude correction within the listed time periods, the timing of the corrective action, to the discretion of the decision-maker.

*Smith,* 251 F.Supp.2d at 1260 (holding that choice of Coast Guard as to when to correct problem was based on considerations of public policy since it accounted for allocation of resources among competing needs). Hence, we find that the Coast Guard was vested with discretion in correcting discrepant Buoy No. 2. Although the Coast Guard is urged to respond within a suggested period of time, the Coast Guard is given leeway in the manner in which it will respond in the search and replacement of a discrepant aid to navigation.

It is also evident that the challenged governmental actions and decisions were based on considerations of public policy, thus meeting the second step of the *Gaubert* test. "In the instant case, the challenged conduct is rooted in the Coast Guard's broad authority to operate and maintain aids to navigation. There are well-established policy Considerations associated with these responsibilities...." *Capt. Chance, Inc.,* 506 F.Supp.2d at 1204 (*citing* 14 U.S.C. § 81). Among these policy considerations is the evaluation "of agency resource constraints, which include but are not limited to financial concerns." *Cranford,* 466 F.3d at 960. Besides, if this Court were to agree with plaintiffs, we would be second-guessing the Coast Guard's policy decisions and would be going against the clear intent of the implied discretionary function exception, which is "to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *See Limar Shipping Ltd.,* 324 F.3d at 10 (internal citations omitted). Accordingly, we firmly believe that the Coast Guard's conduct is susceptible to policy analysis.

In light of the foregoing, we find that the Coast Guard's decisions with respect to the maintenance of aids to navigation involved elements of judgment or choice and is the type of judgment that the discretionary function exception is designed to protect from liability.

### 4. Provide Warning of Discrepancies in Aids to Navigation

In their amended complaint, Plaintiffs allege that the United States failed to properly warn mariners of off-station and deficient aids to navigation in the entrance to the San Juan Harbor. *See* Docket No. 29 at ¶ 46. Plaintiffs complain that the Coast Guard failed to warn that Buoys No. 2 and 4 were off-station, and that the range lights did not mark the center of the Bar Channel. The situation regarding Buoy No. 4 has already been discussed. *See supra* note 12. As to the range lights,

the very definition of this aid to navigation states that the "*appropriate* nautical chart must be consulted when using ranges to determine whether the range marks the centerline of the navigable channel and also what section of the range may be safely traversed," *see supra* note 10. Therefore, according to the relevant regulation, it is the duty of the mariner to look into whether or not the range marks the center of a channel. In light of the above, the only issue to be discussed herein is whether or not the Coast Guard failed to inform mariners that Buoy No. 2 was off-station.

As discussed in the previous sections, we must first look into the applicable federal statutes and regulations to determine whether an element of judgment or choice is present. In their Opposition, Plaintiffs did not cite to any federal statutes or offered any internal agency documents that sustain their allegations of negligence regarding the issue of the Coast Guard's faulty notifications or lack thereof. Neither have they identified any statute, regulation or policy that deprives the federal government of discretion with respect to the content of safety and security information in the notices to mariners. Notwithstanding, it is important to note that the relevant regulation with regards to the issuance of warnings states that "[t]he Coast Guard makes *reasonable* efforts to inform the navigator of known discrepancies." 33 C.F.R. § 62.21 (emphasis ours). As determined in the preceding section, the language of this statute vests the Coast Guard with discretion in assessing

whether or not to notify mariners of a discrepancy in an aid to navigation.

Despite the foregoing, it is undisputed that the Coast Guard published that Buoy No. 2 was off-station in its weekly Local Notice to Mariners of April 16, 2002 (LNM 16–02) and its monthly Local Notice to Mariners of May 2002 (LNM 19–02). The Coast Guard also issued a Broadcast Notice to Mariners[20] on June 15, 2007, reporting that Buoy No. 2 at the San Juan Harbor was off-station. *See United States Coast Guard Radio Log of June 15, 2001,* Docket No. 124, Exhibit 16. Finally, Pilot Soils was informed by the pilot station that Buoy No. 2 was off-station when he boarded the PROVIDENCE at 5:00 a.m. on July 17, 2002. *See Report of Marine Accident,* Docket No. 139, Exhibit 4. Therefore, to the extent that the Coast Guard complied with the relevant directives, the discretionary function applies. *Gaubert,* 499 U.S. at 324, 111 S.Ct. 1267 ("if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected").

### C. Applicability of *Indian Towing*

■ Lastly, we must address the argument set forth by Plaintiffs that once the United States made the decision to mark the entrance to the new Bar Channel and induce reliance on the aids to navigation, it had a duty to exercise due care in their placement, their operation and their maintenance.

**20.** "Broadcast Notices to Mariners are made by the Coast Guard through Coast Guard and Navy radio stations. These broadcast notices ... are *navigational warnings that contain information of importance to the safety of navigation.* Included are reports of deficiencies and *changes to aids to navigation* ... and other important hydrographic information." *See* Docket No. 124, Exhibit 2: *Light List,*

*Volume III, Atlantic and Gulf Coasts* (2001), page viii (emphasis ours). *See also* 33 C.F.R. § 62.21(c)(5): "The mariner should also listen to Coast Guard Broadcast Notices to Mariners. These broadcasts update the Local Notice to Mariners with more timely information. Mariners should monitor VHF–FM channel 16 to locate Coast Guard Marine Information Broadcasts."

In their opposition, Plaintiffs concede that they "are not claiming that the United States should have used more buoys, or different buoys, than the ones it decided to use to mark the Bar Channel; or that the range it envisioned to lead mariners through the new Channel should not mark the center of the Channel; or that the Channel should have been dredged or aligned differently" because it is "clear that the United States is shielded by the discretional function exception in the area or stage of design of a federal navigation project. However, the United States does not have discretion to create, and ignore, danger or to mislead mariners into the belief that it is providing something that is not." *See* Docket No. 139 at page 29. It is then Plaintiffs' contention that the United States cannot be "shielded by the discretional function exception if the project was carried in negligent fashion." *Id.* at page 29. According to Plaintiffs, "[o]nce the United States decided the number of buoys and what type of buoys it would use to mark the new Bar Channel, and where it would position these buoys, as well as the range to mark the approach through the Channel, it was required do so in a non-negligent manner." *Id.* Plaintiffs also claim that the United States has a duty to exercise due care in the maintenance of the aids to navigation it has chosen to establish. *Id.* at 40.[21] In the development of their argument, Plaintiffs heavily rely on the United States Supreme Court's decision in *Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). After a careful review of the applicable law, we resolve that their reliance is misguided as Plaintiffs' interpretation of *Indian Towing* "has been severely undercut, if not altogether disavowed by the Supreme Court in *Gaubert," Cranford,* 466 F.3d at 959, as well as other First Circuit Court decisions. We explain.

In *Indian Towing,* plaintiffs brought suit against the United States alleging that the Coast Guard's negligence in the operation of a lighthouse caused the grounding of a boat. The Supreme Court held that "[t]he Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light ... and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order." *Indian Towing,* 350 U.S. at 69, 76 S.Ct. 122. The Court added that "if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning." *Id.*

In 1979, the First Circuit held, while construing the teachings of *Indian Towing,* that the Supreme Court ruled that "[t]he government, just as any private person who undertakes to warn the public of danger and thereby induces reliance, must not worsen the position of those who have come to rely on the service by carelessly omitting it." *Chute,* 610 F.2d at 13–14. The First Circuit elaborated on the issue stating that *Indian Towing,* however, did not support the proposition that once the Coast Guard decided to mark an obstruction, it had the duty to mark it properly, that is, "that the most effective and best means must always be selected." *Id.* The

21. In its reply, the United States points out that Plaintiffs' challenges to the discreet aspects of the very design that they concede is discretionary and susceptible to policy analysis should be rejected by this Court. *See* Docket No. 142 at page 7. The United States explains that "Plaintiffs' argument must be rejected because it ignores the plain language of the discretionary function exception, which provides that the exception applies ' whether or not the discretion involved be abused.' 28 U.S.C. § 2680(a)." *See* Docket No. 142 at page 4. We agree, but will nevertheless engage in the applicable analysis.

Court decreed that "[t]o come within the reliance doctrine of *Indian Towing,* it would, at very least, have to appear that use of a wreck buoy in these circumstances was tantamount to creating a booby trap which actually worsened the position of those it was meant to help." *Id.* at 15. Finally, the Court concluded that the Coast Guard's decision to mark a submerged wreck with a small buoy rather than a larger buoy did not render it liable under the doctrine of *Indian Towing* based on the theory that the wreck was not marked "properly." The Court ruled that it was for the government to decide on the extent of care it wished to undertake.

> *Indian Towing* does not invite, as plaintiffs would have it, an assessment of the appropriateness of the particular navigational aid established; liability was not imposed in that case because a more powerful light or taller lighthouse would have been a better warning of the rocks marked by the lighthouse, but rather because the negligent non-functioning of the charted lighthouse misled plaintiff to his detriment. As we have stated previously, the principle laid down in

> *Indian Towing* ... (is) that the government must not mislead, and must not induce reliance upon a belief that it is providing something which, in fact, it is not providing. Here there was no such inducement. The buoy, of a standard type used by the Coast Guard, was in actuality located precisely as represented on the [ ] Chart [ ]. The wreck was marked exactly as it was purported to be, and whether or not that marking is deemed the best suitable from a safety point of view, the United States is not liable under *Indian Towing.*

*Chute,* 610 F.2d at 14 (internal citations omitted).

In *Brown v. U.S.,* 790 F.2d 199 (1st Cir.1986), plaintiffs—personal representatives of the estates of three deceased fishermen—brought suit against the United States charging it with negligence for the failure to repair or replace a sporadically malfunctioning weather buoy. The failure to do so was alleged to be the proximate cause of the death of certain fishermen who assertedly relied on an inaccurate weather report. Referring to *Indian Towing* in its analysis, the Court explained: "Two principles are thus involved: the government's free right to engage, or not, in discretionary functions, but with a cutoff where by its conduct, it has induced justified reliance on its adequate performance. The important word is 'justified.'" *Brown,* 790 F.2d at 201. In its discussion of First Circuit precedent, the Court in *Brown* went on to explain that "[t]he rationale of *Chute* was that although the Coast Guard is known to have undertaken marking dangers to navigation, the extent to which it will do so is a discretionary function. There can be no *justified* reliance upon, or expectation of, any particular degree of performance; something more is needed to establish liability." *Brown,* 790 F.2d at 201–202 (emphasis ours). The Court, thus, "flatly rejected the notion that a plaintiff can recover by showing that a discretionary function performed by an agency was 'inadequate,'" *Attallah v. U.S.,* 758 F.Supp. 81, 89 (D.P.R.1991) (citing *Brown v. U.S.*), and concluded that liability does not attach "[w]here the government does not create a danger but rather only fails to 'render adequate performance.'" *Limar Shipping Ltd.,* 324 F.3d at 11–12 (citing *Brown* ). Furthermore, in an effort to make a distinction, the Court found that in *Indian Towing* the government created a danger by representing that an operating lighthouse was present, whereas under the facts in *Brown,* the government did not itself create the danger—in this case the

weather—but merely issued weather advisories.

In *Limar Shipping Ltd.*, the owner and operator of a vessel sued the United States pursuant to the SAA for the damages sustained by the vessel after it was grounded in the Boston Harbor allegedly due to failure of the government nautical chart to accurately depict the harbor's depth. *See Limar Shipping Ltd.*, 324 F.3d 1 (1st Cir. 1976). Plaintiffs in this case argued that once the National Oceanic and Atmospheric Administration (NOAA) made the decision to create a chart, it had a duty to produce it accurately in accordance with the principles of *Indian Towing*. In its decision, rendered after the Supreme Court's holdings in *Gaubert*, the First Circuit disagreed with plaintiffs stating that "*Indian Towing* can be distinguished from the instant case because there the government conceded that the discretionary function exception did not apply." *Limar Shipping Ltd.*, 324 F.3d at 9. The Court concluded that the decision by the NOAA to use data generated by the Corps' condition survey of the harbor when creating the nautical chart was discretionary and was type of decision intended to be protected by the discretionary function exception.

In a footnote, the *Limar* Court explained that the principles of *Indian Towing* would have applied had plaintiffs challenged NOAA's actual use of the Corps' data as negligent, because once NOAA exercised its discretion to use the Corps' data it had to do so in a non-negligent manner. *Id.* at 9 n. 8. Plaintiffs in this case cling with hope to the content of this footnote, which is clearly *dicta*. However, after a comprehensive reading of *Limar*, we find that the Court did not stop there in its evaluation of the applicability of *Indian Towing*. Notwithstanding the above-mentioned footnote, the Court further stated that "[e]ven if the decision to use the Corps' survey is not protected by the discretionary function exception, we find that no liability attaches here." The Court, limiting the scope of *Indian Towing*, conditioned the applicability of the Supreme Court case only to situations where reliance is reasonable. Thus, the chart in question would need to induce *reasonable reliance* on the part of mariners for the government to be found liable to plaintiffs pursuant to *Indian Towing*. On the contrary, the Court ruled that a mariner's reliance on a year-old chart was unreasonable. *Limar Shipping Ltd.*, 324 F.3d at 11.[22] Finally, the Court concluded, allud-

22. Relevantly to the case at hand, the Court in *Limar* noted that the fact that the state of Massachusetts requires that foreign vessels employ a special harbor pilot in the Boston Harbor suggests that the Massachusetts legislature believed that reliance on the accuracy of a chart was unreasonable. The Court went on to say:

Were such reliance reasonable, then nautical charts alone would be sufficient for navigation, and presumably a mariner inexperienced with the Boston Harbor would be able to maneuver a vessel safely through its waters by simply using a chart. Even if there were no statutory requirement for an experienced harbor pilot, the prudent mariner does not rely on charts alone when navigating a body of water. *See, e.g., Sheri-*

*dan Transp. Co. v. United States*, 897 F.2d 795, 798 (5th Cir.1990) ("aids to navigation do not exist in a vacuum and there are various documents which a mariner must use to determine whether he is justified in relying on an aid"); *Tidewater Marine, Inc. v. Sanco Int'l, Inc.*, 113 F.Supp.2d 987, 997 (E.D.La.2000) ("Buoys, radar, Loran, charts, Notices to Mariners, and lookouts are all aids to navigation. None of these alone can be considered absolute indicators of sea conditions."). Here, the chart itself contained prominent warnings that mariners should look to other sources for up-to-date information about the harbor. Because a mariner cannot reasonably rely solely on a chart, nautical charts do not induce reliance such that the government

ing to *Brown,* that in the alternative, the government did not create the dangers in the Boston Harbor.

Finally, in *Thames Shipyard and Repair Co. v. U.S.,* 350 F.3d 247 (1st Cir. 2003), *cert. denied,* 542 U.S. 905, 124 S.Ct. 2849, 159 L.Ed.2d 269 (2004) the First Circuit delivered a final blow to the applicability of *Indian Towing* in cases where the discretionary function exception under the SAA is at issue. In *Thames Shipyard and Repair Co.,* the owner of a sunken fishing vessel and the vessel's insurer sued the United States alleging that the vessel sunk due to the negligence of the Coast Guard. Plaintiffs' contention was that the Coast Guard exceeded its authority by coercively compelling the vessel's master to leave the vessel against his will, negligently interfered with the efforts of the commercial salvor, and deprived the sinking vessel of other possible sources of assistance. In its analysis, the Court found *Indian Towing* to be inapposite for two reasons: (1) in *Indian Towing,* the discretionary function exception was not at issue because the government conceded that it did not apply; and (2) as this Court has interpreted *Indian Towing* "through the lens of later Supreme Court decisions, it illustrates a situation where there was no exercise of policy judgment but rather involved purely technical or scientific consid-

erations." *Thames Shipyard and Repair Co.,* 350 F.3d at 255. Furthermore, the Court decreed that "had a policy-based reason for failing to maintain the lighthouse been articulated, the result [in *Indian Towing* ] might have been different." *Id.* (*citing Ayer v. United States,* 902 F.2d 1038, 1042 (1st Cir.1990)). According to the Court in *Thames Shipyard and Repair Co., Indian Towing* does not stand for the proposition that a Coast Guard determination made during the course of a mission may not be protected by the discretionary function exception in appropriate circumstances. *Thames Shipyard and Repair Co.,* 350 F.3d at 256. "Indeed, to hold differently could be said to fly in the face of the Supreme Court's decision in *Gaubert,* 499 U.S. at 325–26, 111 S.Ct. 1267, which rejects a distinction between initiation of programs and decisions made at an operational level." *Id.*

In accordance with the foregoing, we restate that Plaintiffs' reliance on *Indian Towing* in its contention that once the Coast Guard utilized its discretion to mark the Bar Channel, it automatically was subject to a duty of due care is mistaken simply because *Indian Towing* is no longer "persuasive authority in the context of the discretionary function exception." *Harrell v. U.S.,* 443 F.3d 1231, 1237 (10th Cir.2006).[23]

has a duty to ensure their accuracy, especially where the government specifically directs mariners to other publications through warnings or cautions on the chart itself.FN9

FN9 [...] We believe an adequate warning, such as a Notice to Mariners, regarding possible inaccuracies in a chart may absolve the government of liability because the navigator would no longer be entitled to rely on the navigational aid.... Thus, where, as here, mariners are warned to look to recent Notices to Mariners for the latest information regarding a waterway, the due care obligation is met.

*Limar Shipping Ltd.,* 324 F.3d at 11 (internal citations and quotation marks omitted).

**23.** In a recent decision of the Tenth Circuit, *Harrell v. U.S.,* 443 F.3d 1231, 1237 (10th Cir.2006), the Court ruled as follows with regards to the applicability of Indian Towing to the discretionary function exception analysis:

Since *Gaubert,* several Circuit Courts of Appeals, including the Tenth Circuit, have expressly recognized that *Indian Towing* is simply not persuasive authority in the context of the discretionary function exception-both because the government in that case

■ Even if the Coast Guard's decisions were not protected by the discretionary function exception, we find that no liability attaches here. This Court is unable to conclude that the acts and/or omissions of the Coast Guard created a "booby trap which actually worsened the position of those it was meant to help." *Chute*, 610 F.2d at 15. As declared by Pilot Solis in his deposition, the day of the grounding he did what he's always done for sixteen years and had never had an accident. *See* Docket No. 139, Exhibit 34 at page 177. Moreover, as evinced by the United States in its reply, between March and June of 2002, during the periods in which Buoy No. 2 was off-station, there were 676 successful entries into the San Juan Harbor. Two of these entries were performed by the PROVIDENCE on March 25th and May 6th of 2002. *See* Docket No. 142, Exhibit 23. Consequently, the doctrine of *Indian Towing* is inapplicable because it does not appear that the Coast Guard's decisions with regards to the marking of the improved San Juan Bar Channel "created a danger" or a "booby trap" to mariners.

What is more, as set forth in *Limar*, the principles of *Indian Towing* apply only where reliance is reasonable. *Limar Shipping Ltd.*, 324 F.3d at 11. As previously discussed, the Code of Federal Regulations encourages navigators to consult several publications, *see supra* note 9, including a publication called the United States Coast Pilot ("the Coast Pilot"). *See* 33 C.F.R. § 62.21(c)(2). The Coast Pilot is published by the National Ocean Service and its purpose is to supplement the information shown on nautical charts. *Id.* This publication states that notices to mariners, both local and weekly, report changes in aids to navigation, depths of channels and other useful marine information, and thus, they "should be used routinely for updating the latest editions of nautical charts...." See Docket No. 124, Exhibit 20, *United States Coast Pilot, Atlantic Coast: Gulf of Mexico, Puerto Rico, and Virgin Islands*, 2002 (29th Edition), at page 2 ¶ 26. The Coast Pilot also promulgates that vessels operating within the limits of the Coast Guard district can obtain information affecting charts from the Local Notices to Mariners, *see id.* at page 2 ¶ 32, and that "[i]t is essential for navigators to keep charts corrected through information published in the notices to mariners ...," *see id.* at page 19 ¶ 439. Thus, where, as here, federal statutes, regulations and publications contain prominent warnings that mariners should look to other sources for up -to-date information about the harbor, a mariner cannot reasonably rely solely on an old chart. Moreover, the Light List clearly states that, because buoys are floating aids to navigation, their reliability is limited. *See supra* note 9. Accordingly, where the government does not induce reliance on nautical charts

conceded that the exception did not apply and because the distinction between "operational negligence" and "discretionary functions" no longer exists. *See Thames Shipyard & Repair Co. v. United States*, 350 F.3d 247, 255 (1st Cir.2003) (finding *Indian Towing* inapposite because the discretionary function exception was not at issue); *Ochran v. United States*, 117 F.3d 495, 505 (11th Cir.1997) ("*Indian Towing*, however, has been severely undercut, if not altogether disavowed, by the Supreme Court in *Gaubert*."); *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 977 (10th Cir. 1994) (finding *Indian Towing* inapposite in discretionary function context because the government conceded that the exception did not apply); *Baum v. United States*, 986 F.2d 716, 723 (4th Cir.1993) (finding *Indian Towing* "inapplicable" in discretionary function context); *see also Alfrey v. United States*, 276 F.3d 557, 567 (9th Cir.2002) (rejecting reliance on *Indian Towing* in discretionary function context in part because the discretionary function exception was not at issue in *Indian Towing* ).

nor floating aids to navigation, liability cannot attach. *See Limar Shipping Ltd.,* 324 F.3d at 11.

Plaintiffs also complain that the United States did not provide clear and timely notice to the British Admiralty [24] or to the international maritime community of the changes to the Bar Channel. *See* Docket No. 139 at page 40. After a careful review of the applicable federal directives, we find that, contrary to what Plaintiffs' would like us to believe, it is not the responsibility of the agencies in charge of disseminating information regarding navigational safety to make sure that every single mariner, domestic or abroad, is cognizant of such information. On the contrary, according to the relevant federal statutory provisions, it is the duty of all mariners and navigators to consult all WNTM's and LNM's before undertaking the navigation of a vessel. *See* 33 C.F.R. § 62.21.

Here, it is undisputed that the government issued several warnings with regards to the changes in the configuration and the navigational aids of the San Juan Harbor in various Local Notices to Mariners and Weekly Notices to Mariners. Where, as here, the government has advised mariners to look to recent notices to mariners for the latest information regarding a waterway, any due care obligation is met. *See Limar Shipping Ltd.,* 324 F.3d at 11 n. 9. "[T]he Government's obligation ceases at that time in which a prudent shipowner-navigator would have reasonably received the Notice to Mariner advising of the publication of a revised chart correctly portraying the condition in question." *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140, 149 (5th Cir.1971). Whether or not the mariners of the PROVIDENCE or Pilot Soils were prudent enough to stay

informed by reading these notices prior to the grounding is another story.

In conclusion, having this Court determined that the challenged government actions are indeed discretionary "whether or not these were negligently carried out is of no consequence for purposes of [the discretionary function exception]." *See Montijo Reyes v. U.S.,* 349 F.Supp.2d 234, 239 (D.P.R.2004) (*citing Magee v. U.S.,* 121 F.3d 1, 5 n. 2 (1st Cir.1997); *Attallah v. United States,* 955 F.2d 776, 784 n. 13 (1st Cir.1992)). "[T]he application of this exception is a threshold jurisdictional issue which precedes any negligence analysis." *Wallace v. U.S.,* 991 F.Supp. 1285, 1287 (D.C.N.M.1996) (*citing Johnson v. Unites States of America, Department of Interior,* 949 F.2d 332, 335 (10th Cir.1991)). Because, under the facts of the instant case, the discretionary function exception applies to the challenged governmental conduct, the United States retains its sovereign immunity and the district court lacks subject matter jurisdiction to hear the suit. *See id.*

### III. CONCLUSION

For the reasons set forth above, the United States Motion to Dismiss (Docket No. 124) is **GRANTED.** Thus, Plaintiffs' claims against the United States pursuant to the Suit in Admiralty Act are hereby **DISMISSED WITH PREJUDICE.** Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

**24.** According to Plaintiffs, the PROVIDENCE utilized British Charts, which are updated by the British Admiralty, a world recognized charting authority. *See* Docket No. 139 at ¶ 17.